UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
DIANA RENE,

                  Plaintiff,                              PLAINTIFF'S COUNTER-
                                            STATEMENT PURSUANT
   -against-                                    LOCAL RULE 56.1 TO THE
                                            56.1 STATEMENT OF
                                            DEFENDANT MUSTAFA


TANZIA MUSTAFA, M.D., personally,          CV-16-4072 (JS) (SLT)
EJIKE ONUOGU, M.D., personally
TAHIRA N. SIAL, M.D., personally,
BRUNSWICK HOSPITAL CENTER, INC.,

                  Defendants.
-------------------------------------------------------------------------x


      Pursuant to Local Rule 56.1, the plaintiff responds to defendant Mustafa's Local Rule

56.1 statement as follows:

      STATEMENT

      1.      The plaintiff, DIANA RENE ("RENE") is a resident of the County of Suffolk in

the State of New York (Exhibit "H").

      RESPONSE

      1.      The plaintiff admits fact statement one.

      STATEMENT

      2.      TANZIA MUSTAFA, M.D. ("MUSTAFA") is a psychiatrist licensed to practice

medicine in the State of New York, and is Board Certified in Psychiatry (Exhibit "L", p. 7).

      RESPONSE

      2.      The plaintiff admits fact statement two.

STATEMENT

3.      MUSTAFA graduated medical school from Sir Salimullah Medical College in 1991 (Exhibit "L", p. 5).

RESPONSE

The plaintiff admits fact statement three.

STATEMENT

4.      After medical school, MUSTAFA performed a residency at Elmhurst Hospital Center, Mount Sinai School of Medicine (Exhibit "L", p. 6).

RESPONSE

4.      The plaintiff admits fact statement four.

STATEMENT

5.      After completing her residency, MUSTAFA joined Queens General Hospital as an outpatient psychiatric attending physician (Exhibit "L", p. 6).

RESPONSE

5.      The plaintiff admits fact statement five.

STATEMENT

6.      After working for two years at Queens General Hospital, MUSTAFA joined Elmhurst Hospital as an inpatient psychiatric attending physician, where she worked for seven years, until 2012. (Exhibit "L", p. 6).

RESPONSE

6.      The plaintiff admits fact statement six.

STATEMENT

7.      After working for one year at Kings County Hospital following her work at

2

Elmhurst, MUSTAFA joined Stony Brook University Hospital in 2014 (Exhibit "L", p. 6).

RESPONSE

7.      The plaintiff admits fact statement seven.

STATEMENT

8.      In addition to working at various hospitals, MUSTAFA ran a successful private practice from 2005 to 2015 (Exhibit "L", p. 6).

RESPONSE

8.      The plaintiff admits fact statement eight.

STATEMENT

9.      Kristi Graziano ("Graziano") was completing an internship at Stony Brook University Hospital on July 24, 2015 as part of pursuing a Master's in social work (Exhibit "M", p. 9-10).

RESPONSE

9.      The plaintiff admits fact statement nine.

STATEMENT

10.     Sridhar Kadiyala, M.D. ("Kadiyala") was a psychiatric resident at Stony Brook University Hospital (Exhibit "L", p. 38-39, 40).

RESPONSE

10.     The plaintiff admits fact statement ten.

STATEMENT

11.     BRUNSWICK HOSPITAL CENTER, INC. ("BRUNSWICK") is located at 81 Louden Avenue, Amityville, New York, and is licensed by the New York Office of Mental Health to provide psychiatric services (Exhibit "H").

RESPONSE

11.    The plaintiff admits fact statement eleven.

STATMENT

12.    EJIKE ONUOGU, M.D. ("ONUOGU") was a physician working for Brunswick Hospital Center (Exhibit "H").

RESPONSE

12.    The plaintiff admits fact statement twelve.

STATEMENT

13.    ONUOGU graduated medical school from the University of Nigeria in 1987 and performed a psychiatric residency at Bronx Lebanon Hospital between 1992 and 1997 (Exhibit "N", p, 7-8).

RESPONSE

13.    The plaintiff admits fact statement thirteen.

STATEMENT

14.    ONUOGU has Board Certifications in Psychiatry with the American Board of Psychiatric Medicine, the American Board of Psychiatry and the American Board of Physician Specialists (Exhibit "N", p. 8).

RESPONSE

14.    The plaintiff admits fact statement fourteen.

STATEMENT

15.    After completing his residency, ONUOGU performed a one-year fellowship in Geriatric Psychiatry at Albert Einstein College of Medicine, after which he worked at the Rikers Island Correctional Facility and at SUNY Binghamton Central New York Psychiatric Center

4

(Exhibit "N", p. 9).

RESPONSE

16.    ONUOGU also worked in the psychiatric unit of Bronx Lebanon Hospital and at the psychiatric emergency room of Jacobi Medical Center (Exhibit "N", p. 10).

RESPONSE

16.    The plaintiff admits fact statement sixteen.

STATEMENT

17.    ONUOGU admitted RENE to BRUNSWICK on 7/25/15 (Exhibit "N", p, 12).

RESPONSE

17.    The plaintiff disputes fact statement seventeen.  The Brunswick Hospital Center chart for the plaintiff details that the facility admitted her at 5:40 p.m. on July 25, 2015 but defendant Onuogu did not evaluate the plaintiff until approximately 11:00 that night. Declaration of Amy Bedell dated July 23, 2020 ("Bedell Decl.") Exh. O at 2; 35; 156.

STATEMENT

18.    TAHIRA SIAL, M.D. ("SIAL") was a physician working for BRUNSWICK as of 7/25/15 (Exhibit "H").

RESPONSE

18.    The plaintiff admits fact statement eighteen.

STATEMENT

19.    From April through July, 2015, plaintiff Diana Rene suffered from a painful glandular disorder known as parotitis (Exhibit "H").

RESPONSE

19.    The plaintiff admits fact statement nineteen.

STATEMENT

20.     As of July 3rd or 4th, 2015, RENE believed there was no end in sight for her pain (Exhibit "K", p. 47).

RESPONSE

20.     The plaintiff admits fact statement twenty.

STATEMENT

21.     RENE went to approximately six doctors as of July 24, 2015 to address the symptoms she was experiencing, and none of them were able to help (Exhibit "K", p. 52).

RESPONSE

21.     The plaintiff admits fact statement twenty-one.

STATEMENT

22.     As a result of this disorder, on or about July 24, 2015, RENE was suffering from substantial pain on the side of her face, dizziness and nausea (Exhibit "H").

RESPONSE

22.     The plaintiff admits fact statement twenty-two.

STATEMENT

23.     On July 24, 2015, RENE's husband took her to Stony Brook University Hospital ("Stony Brook") for treatment (Exhibit "H").

RESPONSE

23.     The plaintiff admits fact statement twenty-three.

STATEMENT

24.     During discussion with clinical staff in the Stony Brook Emergency Department, RENE stated the following: "I don't know how people live with such pain in the face." (Exhibit

6

"H" and Exhibit "K", p. 57).

RESPONSE

24.     The plaintiff admits fact statement twenty-four.

STATEMENT

25.     RENE could have told Kadiyala that she was depressed because she had

undergone treatment, but continued to have a bad taste in her mouth (Exhibit "K", p. 69).

RESPONSE

25.     The plaintiff admits fact statement twenty-five.

STATEMENT

26.     RENE may have told Kadiyala that she had a loss of appetite (Exhibit "K", p. 70).

RESPONSE

26.     The plaintiff admits fact statement twenty-six.  However, the plaintiff asserts that

the loss of appetite resulted from the effects of a recent surgery.  Affidavit of Diana Rene, sworn

on September 9, 2020 ("Rene Aff."), ¶ 18.

STATEMENT

27.     RENE reported having had a poor appetite (Exhibit "K", p. 73).

RESPONSE

27.     The plaintiff admits fact statement twenty-seven.  However, the plaintiff asserts

that the statement related to her appetite following her surgery and leading up to her evaluation at

Stony Brook.  Rene Aff., ¶ 18.

STATEMENT

28.     RENE told the Stony Brook staff that she had not had an appetite for three weeks

(Exhibit "K", p. 89).

RESPONSE

28.    The plaintiff admits fact statement twenty-eight.

STATEMENT

29.    RENE may have told Kadiyala that she had lost six pounds in one week (Exhibit "K", p. 70).

RESPONSE

29.    The plaintiff admits fact statement twenty-nine.

STATEMENT

30.    RENE told Kadiyala that she was not sleeping (Exhibit "K", p. 70).

RESPONSE

30.    The plaintiff admits fact statement thirty.

STATEMENT

31.    RENE might have told someone at Stony Brook that she had not slept in two weeks (Exhibit "K", p. 78).

RESPONSE

31.    The plaintiff admits fact statement thirty-one,

STATEMENT

32.    RENE could have told Kadiyala that she was not going out with friends (Exhibit "K", p. 72).

RESPONSE

32.    The plaintiff admits fact statement thirty-two

STATEMENT

33.    RENE told the Stony Brook staff that she did not feel like doing the things that

she used to enjoy, such as watching a Yankees game (Exhibit "K", p. 87).

RESPONSE

33.     The plaintiff admits fact statement thirty-three.

STATEMENT

34.     RENE might have told the Stony Brook staff that she just goes home and goes to

bed (Exhibit "K", p. 87).

RESPONSE

34.     The plaintiff admits fact statement thirty-four.  However, the plaintiff asserts that

this is an incomplete statement because the plaintiff meant that at time she came home and took a

nap and then awoke to do whatever she would otherwise do.  Rene Aff., ¶ 39.

STATEMENT

35.     RENE told the staff at Stony Brook that she worries nonstop and that she feels

depressed because she worries that her health issues were not resolving (Exhibit "K", p. 87-88).

RESPONSE

35.     The plaintiff admits fact statement thirty-five.

STATEMENT

36.     RENE may have experienced crying episodes in the three month period leading

up to her presentation to Stony Brook (Exhibit "K", p. 132).

RESPONSE

36.     The plaintiff admits fact statement thirty-six.

STATEMENT

37.     On 7/24/15 at approximately 9:52, Dr. Erika Newton ("Newton") documented in

the Stony Brook chart that RENE said that she wanted to take her life as a result of the symptoms

9

she was experiencing (Exhibit "L", p. 56 and Exhibit "U", pp.109-112).

RESPONSE

37.    The plaintiff admits fact statement thirty-seven.  However, the plaintiff asserts

that Dr. Newton's chart entry was not accurate.  Rene Aff., ¶¶ 24-25.

STATEMENT

38.    On 7/24/15 at approximately 9:52, Newton documented in the Stony Brook chart

that RENE was medically cleared for transfer to the psychiatric emergency room for depression

and suicidal ideation (Exhibit "U", pp. 109-112).

RESPONSE

38.    The plaintiff admits fact statement thirty-eight.

STATEMENT

39.    On 7/24/15 at approximately 14:56, Nurse Thomas Fining ("Fining") documented

in the Stony Brook chart that RENE said that the quality of her life has gone down and that she

has lost the zest for life (Exhibit "U", p. 11).

RESPONSE

39.    The plaintiff admits that Mr. Fining documented that the quality of her life had

gone down and that she lost her zest for life.  However, the plaintiff disputes that she made such

statement to Mr. Fining.  Rene Aff., ¶¶ 29-30.

STATEMENT

40.    On 7/24/15 at approximately 14:56, Fining documented in the Stony Brook chart

that RENE said that she had thoughts of wanting to leave this earth (Exhibit "U", p. 11).

RESPONSE

40.    The plaintiff admits that Mr. Fining documented that the plaintiff had thoughts of

wanting to leave this earth.  However, the plaintiff disputes having told Mr. Fining that she had

thoughts of wanting to leave this earth or otherwise making any statement acknowledging that

she had suicide thoughts.   Rene Aff., ¶ ¶ 25; 35; 36.

STATEMENT

41.   On 7/24/15 at approximately 14:56, Fining documented in the Stony Brook chart

that RENE said that she did not want to be a burden to anyone (Exhibit "U", p. 11).

RESPONSE

41.   The plaintiff admits fact statement forty-one.  However, the plaintiff asserts that

she simply was not happy about her family having to go out of their way to help her because  of

her physical condition.  Rene Aff., ¶ 31.

STATEMENT

42.   On 7/24/15 at approximately 14:56, Fining documented in the Stony Brook chart

that RENE reported having had a history of depression (Exhibit "U", p. 11).

RESPONSE

42.   The plaintiff admits that Mr. Fining documented that the plaintiff reported that

she had a history of depression.  However, the plaintiff disputes having a history of depression or

telling anyone that she had a history of depression.  Rene Aff., ¶ 28.

STATEMENT

43.   On 7/24/15 at approximately 14:56, Fining documented in the Stony Brook chart

that RENEE had reported a wish to be dead in the past month prior to her presentation to the

hospital (Exhibit "U", p.11).

RESPONSE

43.   The plaintiff admits that Mr. Fining documented that the plaintiff reported a wish

to be dead in the past month.  However, the plaintiff disputes ever having a wish to be dead at any time and telling anyone that she had a wish to be dead.  Rene Aff., ¶ 35.

STATEMENT

44.     On 7/24/15 at approximately 14:56, Fining completed the Columbia Suicide Severity Scale and documented in the Stony Brook chart that RENE had thoughts of wishing to be dead two-to-five times a week in the past month (Exhibit "L", p. 54 and Exhibit "U", p. 29).

RESPONSE

44.     The plaintiff admits that Mr. Fining completed the Columbia Suicide Severity Scale and documented that the plaintiff had thoughts of wishing to be dead two-to-five times a week in the past month.  However, the plaintiff disputes that she ever had thoughts of wishing to be dead at any time.  Rene Aff., ¶ 35.

STATEMENT

45.     On 7/24/15 at approximately 14:56, Fining completed the Columbia Suicide Severity Scale and documented in the Stony Brook chart that RENE was having thoughts of dying (Exhibit "L", p. 71 and Exhibit "U", pp. 11-12).

RESPONSE

45.     The plaintiff admits that Mr. Fining documented that the plaintiff was having thoughts of dying.  However, the plaintiff disputes ever having thoughts of dying and further disputes ever having told anyone that she had thoughts of dying.  Rene Aff., ¶ 35.

STATEMENT

46.     In the Stony Brook chart, Fining completed the Columbia Suicide Severity Scale and documented that RENE wished to be dead and had thoughts of wanting to leave the earth two-to-five times per week (Exhibit "L", p. 54 and Exhibit "U", p. 29).

ANSWER

46.　　The plaintiff admits that Mr. Fining documented that she wished to be dead and had thoughts of wanting to leave the earth two-to-five times per week.  However, the plaintiff disputes ever having thoughts of wanting to leave the earth and telling anyone that she wanted to leave the earth.  Rene Aff. ¶¶ 25; 35.

STATEMENT

47.　　On 7/24/15 at approximately 14:56, Fining completed the Columbia Suicide Severity Scale and documented in the Stony Brook chart that RENE's rationale for suicide would be to completely stop the pain she was experiencing (Exhibit "U", p. 29).

RESPONSE

47.　　The plaintiff admits that Mr. Fining documented that the plaintiff's rationale for suicide would be to completely stop the pain that she was experiencing.  However, the plaintiff disputes ever having thoughts of suicide as a way to stop pain that she was experiencing and having told anyone that she had thoughts of suicide as a way to stop the pain that she was experiencing.  Rene Aff., ¶ 35.

STATEMENT

48.　　On 7/24/15 at approximately 14:56, Fining documented that RENE reported feeling unsafe (Exhibit "U", p. 11).

RESPONSE

48.　　The plaintiff admits that Mr. Fining documented that the plaintiff reported that she felt unsafe.  However, the plaintiff disputes ever feeling unsafe.  The plaintiff further disputes telling anyone that she felt unsafe.  Rene Aff., ¶ 36.

STATEMENT

49.      On 7/24/15, at approximately 18:23, Graziano documented in the Stony Brook chart that RENE reported not having slept in two weeks ((Exhibit "U", p. 83).

RESPONSE

49.      The plaintiff admits that Ms. Graziano documented that she reported not having slept in two weeks.  However, the plaintiff disputes having told Ms. Graziano that she had not slept in two weeks.  Rene Aff., ¶ 38.

STATEMENT

50.      On 7/24/15, at approximately 18:23, Graziano documented in the Stony Brook chart that RENE reported that she did not feel like doing the things that she used to enjoy doing, like watching Yankees games (Exhibit "U", p. 83).

RESPONSE

50.      The plaintiff admits fact statement fifty.

STATEMENT

51.      On 7/24/15, at approximately 18:23, Graziano documented in the Stony Brook chart that RENE reported that she did not feel like doing things that she used to enjoy doing, like watching her favorite shows (Exhibit "U", p. 83).

RESPONSE

51.      The plaintiff admits fact statement fifty-one.

STATEMENT

52.      On 7/24/15, at approximately 18:23, Graziano documented in the Stony Brook chart that RENE reported that her symptoms started the previous March (Exhibit "U", p. 83).

RESPONSE

52.     The plaintiff admits fact statement fifty-two.

STATEMENT

53.     On 7/24/15, at approximately 18:23, Graziano documented in the Stony Brook

chart that RENE reported that she felt depressed (Exhibit "U", p. 83).

RESPONSE

53.     The plaintiff admits that Ms. Graziano documented that she reported that she felt

depressed.  However, the plaintiff asserts that this was because she found her medical condition

depressing  Rene Aff., ¶ 46.

STATEMENT

54.     On 7/24/15, at approximately 18:23, Graziano documented in the Stony Brook

chart that RENE acknowledged having said that she wanted to leave this earth (Exhibit "U", p.

83 and Exhibit "M" p. 23-24).

RESPONSE

54.     The plaintiff admits that Ms. Graziano documented that she acknowledged having

said that she wants to leave this earth.  However, the plaintiff disputes having said that she wants

to leave this earth.  Rene Aff., ¶¶ 25; 41.

STATEMENT

55.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

chart that RENE acknowledged thoughts of passive suicidal ideation crossing her mind (Exhibit

"U", pp. 31-32).

RESPONSE

55.     The plaintiff admits that Dr. Kadiyala documented that the plaintiff acknowledged

that she had passive thoughts of suicide.  However, the plaintiff disputes ever having any

thoughts of suicide.  Rene Aff., ¶ 50.

STATEMENT

56.      On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

chart that RENE reported feeling frustrated and depressed because she was experiencing an

ongoing rancid taste in her mouth (Exhibit "U", p. 31).

RESPONSE

56.      The plaintiff admits fact statement fifty-six.

STATEMENT

57.      On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

chart that RENE reported that she had not slept in weeks (Exhibit "U", p. 31).

RESPONSE

57.      The plaintiff admits fact statement fifty-seven.

STATEMENT

58.      On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

chart that RENE reported that she was not enjoying life (Exhibit "U", p. 31).

RESPONSE

58.      The plaintiff admits Dr. Kadiyala documented that the plaintiff reported that she

was not enjoying life, but disputes she made such a statement.  Rene Aff., ¶ 51.

STATEMENT

59.      On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

chart that RENE reported that she did not feel like answering the phone at home (Exhibit "U", p.

31).

RESPONSE

59.     The plaintiff admits fact statement fifty-nine.  However, the plaintiff asserts that this occurred because of pain and discomfort resulting from recent surgery.  Rene Aff., ¶ 21.

STATEMENT

60.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook chart that RENE reported that she did not feel like going out with friends (Exhibit "U", p. 31).

RESPONSE

60.     The plaintiff admits that Dr. Kadiyala documented that the plaintiff reported that she did not feel like going out with friends.  However, the plaintiff disputes that this was the case except for a period following surgery.  Rene Aff., ¶¶ 10; 21; Affidavit of Dolores Calleja, sworn to on September 2, 2020 ("Calleja Aff."), ¶ 5.

Defendant Mustafa inadvertently omitted paragraph sixty-one but twice set forth paragraphs denominated "62." The plaintiff will not change this numbering.

STATEMENT

62.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook chart that RENE reported that she was isolating herself (Exhibit "U", p. 31).

RESPONSE

62.     The plaintiff admits that Dr. Kadiyala documented that the plaintiff was isolating herself.  However, the plaintiff disputes that she was doing so.  Rene Aff., ¶¶10-12; Affidavit of Joseph Rene, sworn to on September 9, 2020 ("J. Rene Aff."), ¶ 7; Calleja Aff., ¶ 5.

STATEMENT

62.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook chart that RENE reported that she goes to work, goes home and hits the bed without sleep

(Exhibit "U", p. 31).

RESPONSE

62.     The plaintiff admits that Dr. Kadiyala documented that she reported that she goes to work, goes home and hits the bed without sleep.  However, the plaintiff disputes that this was the case.  Rene Aff., ¶¶ 10-12; J. Rene Aff., ¶ 6.

STATEMENT

63.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook chart that RENE reported that she was having bad thoughts about things that had happened to her in the past (Exhibit "U", p. 31).

RESPONSE

63.     The plaintiff admits that the plaintiff reported that she was having bad thoughts about things that happened in the past.  However, the plaintiff disputes ever making such a statement.  Rene Aff., ¶ 48.

STATEMENT

64.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook chart that RENE reported that her sleep was bad (2 hours) for 3 months (Exhibit "U", p. 31).

RESPONSE

64.     The plaintiff admits that Dr. Kadiyala documented that the plaintiff reported that her sleep was bad (2 hours) for three months.  However, the plaintiff disputes saying that she was sleeping two hours a night for three months.  The plaintiff told clinical staff that her sleep was bad in that she was waking up every two hours.  Rene Aff., ¶ 38.

STATEMENT

65.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

18

chart that RENE reported having had a poor appetite and having lost 6 pounds in one week
(Exhibit "U", p.31).

RESPONSE

65.     The plaintiff admits fact statement sixty-five.

STATEMENT

66.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook
chart that RENE endorsed crying episodes secondary to hurting her family (Exhibit "U", p. 31).

RESPONSE

66.     The plaintiff does not dispute fact statement sixty-six but denies that her crying
was related to thoughts of hurting her family.  Rene Aff., ¶ 47.

STATEMENT

67.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook
chart that RENE reported helpless and hopeless ideation ((Exhibit "U", p. 31).

RESPONSE

67.     The plaintiff admits that Dr. Kadiyala documented that the plaintiff reported
helpless and hopeless ideation.  However, the plaintiff disputes telling anyone that she felt
helpless and hopeless.  Rene Aff., ¶ 49.

STATEMENT

68.     On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook
chart that RENE reported having occasional thoughts of hurting herself (Exhibit "U", pp. 31-32).

RESPONSE

68.     The plaintiff admits that Dr. Kadiyala documented that she reported occasional
thoughts of hurting herself but disputes she ever had such thoughts and further disputes ever

19

telling anyone that she had occasional thoughts of hurting herself.  Rene Aff., ¶ 50.

STATEMENT

69.      On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

chart that RENE acknowledged having told her primary care provider that she had thoughts of

jumping off a bridge two months earlier (Exhibit "U", p. 32).

RESPONSE

69.      The plaintiff admits that Dr. Kadiyala documented that she acknowledged having

told her primary care provider that she had thoughts of jumping off a bridge two months earlier

but disputes ever having thoughts of jumping off a bridge and having told her primary care

provider that she had thoughts of jumping off a bridge.  Rene Aff., ¶ 52.

STATEMENT

70.      On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

chart that RENE's husband reported that the inability to determine the cause of the metallic taste

in RENE's mouth was making RENE anxious and depressed (Exhibit "U", p. 32).

RESPONSE

70.      The plaintiff admits that Dr. Kadiyala documented that her husband reported that

the inability to determine the cause of the metallic taste in her mouth was making her anxious

and depressed.

STATEMENT

71.      On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook

chart that RENE's husband said his wife was down in the dumps because her life was not what it

used to be due to her medical issues, and not being able to get ahead financially (Exhibit "U", p.

32).

RESPONSE

71.    The plaintiff admits fact statement seventy-one.

STATEMENT

72.    On 7/24/15 at approximately 21:38, Kadiyala documented in the Stony Brook chart that his impression was that RENE suffered from Depression, NOS (Exhibit "U", p. 36).

RESPONSE

72.    The plaintiff admits that Dr. Kadiyala documented that his impression was that she suffered from Depression NOS.  However, the plaintiff disputes that she suffered from depression.  Declaration of Peter Stastny dated September 15, 2020 ("Stastny Decl.)", ¶¶ 19-34.

STATEMENT

73.    The Stony Brook chart indicates that RENE acknowledged suicidal ideation to the ED staff (Exhibit "O", p. 61 and Exhibit "U", p.31).

RESPONSE

73.    The plaintiff admits that the Stony Brook chart states that she acknowledged suicide ideation to emergency department staff.  However, the plaintiff disputes ever having suicidal thoughts.  Rene Aff., ¶ 50.

STATEMENT

74.    The Stony Brook chart indicates that RENE had occasional thoughts of hurting herself crossing her mind (Exhibit "O", p. 62 and Exhibit "U", p.31-32).

RESPONSE

74.    The plaintiff admits that her Stony Brook chart indicates that she had occasional thoughts of hurting herself that crossed her mind.  However, the plaintiff disputes ever having thoughts of hurting herself.  Rene Aff., ¶ 50.

STATMENT

75.    RENE described episodes of crying and episodes of tearfulness for no reason,
which is a classic symptom of depression (Exhibit "O", p. 65).

RESPONSE

75.    The plaintiff disputes fact statement seventy-five in that she disputes that she was
crying for no reason.  Rene Aff., ¶ 47.

STATEMENT

76.    RENE reported that she was hurting her family because she was not feeling
well, and has therefore been crying more (Exhibit "O", p. 66).

RESPONSE

76.    The plaintiff disputes that she reported that she was hurting her family.  The
plaintiff simply related that she was not happy that she had been placing a burden on her family
because of her physical condition.  Rene Aff., ¶ 31.

STATEMENT

77.    RENE acknowledged to Kadiyala that she had made suicidal statements to her
primary care doctor (Exhibit "O", p. 77).

RESPONSE

77.    The plaintiff disputes fact statement seventy-seven.  Rene Aff., ¶ 52.

STATEMENT

78.    On 7/24/15 at approximately 21:40, Kadiyala documented in the Stony Brook
chart that RENE's recent or presenting psychiatric symptoms included severe depression,
anhedonia, mood lability, severe anxiety and difficulty controlling suicidal thoughts (Exhibit
"U", p. 30).

RESPONSE

78.    The plaintiff admits Dr. Kadiyala documented the symptoms set forth in

paragraph seventy-eight but disputes the accuracies of these clinical conclusions.  Rene Aff., ¶

35; J. Rene Aff., ¶¶ 5-8; Calleja Aff., ¶¶ 4-6; Declaration of Katie D'Esposito dated July 17,

2020 ("D'Esposito Decl,"), ¶¶ 7-8; Stastny Decl., ¶ 19-34.

STATEMENT

79.    On 7/24/15 at approximately 21:40, Kadiyala documented in the Stony Brook

chart that RENE had a history of depression (Exhibit "U", p. 30).

RESPONSE

79.    The plaintiff admits that Dr. Kadiyala documented that she had a history of

depression.  However, the plaintiff disputes that she had a history of depression.  Rene Aff., ¶ 2.

STATEMENT

80.    On 7/24/15 at approximately 21:40, Kadiyala documented in the Stony Brook

chart that RENE had a number of protective factors that suggested reduced risk for suicide

(Exhibit "U", p. 30).

RESPONSE

80.    The plaintiff admits fact statement eighty.

STATEMENT

81.    On 7/24/15 at approximately 21:40, Kadiyala documented having weighed

RENE's risk factors for suicide and the protective factors (Exhibit "U", p. 30).

RESPONSE

81.    The plaintiff admits fact statement eighty-one.

STATEMENT

82.     Kadiyala documented in the Stony Brook chart that he discussed the case with

MUSTAFA (Exhibit "U", p.31).

RESPONSE

82.     The plaintiff admits fact statement eighty-two.

STATEMENT

83.     Kadiyala told MUSTAFA that RENE was a 51 year old married female with quite

a few medical issues ongoing, and that she had presented to the hospital with chest pain.  He said

she was also very depressed, that she met all the criteria of major depressive episode with

suicidal ideation, and therefore wanted MUSTAFA to see her with him because he was not sure

how to manage the case because he was a first or second year resident (Exhibit  "L", p. 40).

RESPONSE

83.     The plaintiff admits that the contents of paragraph eighty-three are consists of

defendant Mustafa's testimony.  However, the plaintiff asserts this is substantially different than

what Dr. Kadiyala said to her.  Rene Aff., ¶ 54.

STATEMENT

84.     Kadiyala told MUSTAFA about the specific content of the suicidal ideation

RENEE was having (Exhibit "L", p. 40-41).

RESPONSE

84.     The plaintiff asserts that the contents of paragraph eighty-four are consists of

defendant Mustafa's testimony.  However, the plaintiff asserts that she never told Dr. Kadiyala

that she had thoughts of suicide.  Rene Aff., ¶ 50.

24

STATEMENT

85.     Specifically, MUSTAFA learned that RENE was making suicidal statements, and that she had discussed thoughts of jumping off a bridge with her primary care provider (Exhibit "L", p. 41-42).

RESPONSE

85.     The plaintiff disputes making any suicidal statements and ever discussing thoughts of jumping off a bridge, which she never had, with her primary care provider.  Rene Aff., ¶ 52.

STATEMENT

86.     In the Stony Brook chart, it was documented that RENE reported that the quality of her life has gone down, that she lost her zest for life, that she had thoughts of wanting to leave the earth and that she did not want to be a burden to anyone (Exhibit "L", p. 70-71 and Exhibit "U", p. 11).

RESPONSE

86.     The plaintiff admits that her Stony Brook chart contains the information set forth in paragraph eighty-six.  However, the plaintiff disputes asserts that she ever reported that the quality of her life has gone down, that she lost her zest for life, that she had thoughts of wanting to leave the earth, and that she did not want to be a burden to anyone.  Declaration of William Brooks dated September 16, 2020 ("Brooks Decl."), Exh. A at 74; Rene Aff., ¶¶ 25; 29; 32; 35.

STATEMENT

87.     In the Stony Brook chart, RENE acknowledged having made statements to her primary care physician that she had thoughts of jumping off a bridge two months earlier (Exhibit "L", p. 61-62 and Exhibit "U", p. 32).

25

RESPONSE

87.     The plaintiff admits that her chart states that she acknowledged making statements to her primary care physician that she had thoughts of jumping off a bridge two months earlier but disputes that she ever made any such statements to her primary care provider and further disputes telling anyone at Stony Brook that she made such statements.  Rene Aff., ¶ 52.

STATEMENT

88.     MUSTAFA went with Kadiyala to the medical Emergency Department to evaluate RENE and discuss the severity of her symptoms (Exhibit "L", p. 40-41).

RESPONSE

88.     The plaintiff disputes fact statement eighty-eight.  Rene Aff., ¶¶ 24; 26-27; 55-57.

STATEMENT

89.     At her deposition, MUSTAFA testified that when she met with RENE for the first time, she spent at least 30 to 45 minutes with her (Exhibit "L", p. 46).

RESPONSE

89.     The plaintiff admits that Dr. Mustafa testified that she met with her for at least 30-45 minutes but disputes that Dr. Mustafa did so.  Rene Aff., ¶ 57.

STATEMENT

90.     RENE was crying incessantly when MUSTAFA met her for the first time (Exhibit "L", p. 52).

RESPONSE

90.     The plaintiff disputes fact statement ninety.  Rene Aff., ¶ 58.

STATEMENT

91.     MUSTAFA gathered from RENE that RENE was very depressed, had suicidal thoughts of death, wishing for death, and posed a danger to herself unless treated (Exhibit "L", p. 53).

RESPONSE

91.     The plaintiff disputes fact statement ninety-one.  Rene Aff., ¶ 35; 50; Stastny Aff., ¶¶ 19-48.

STATEMENT

92.     MUSTAFA performed a mental status exam, and found RENE to be moderately-to-severely depressed, even though she denied suicidal ideation at the time (Exhibit "L", p. 53 and Exhibit "U", p. 37).

RESPONSE

92.     The plaintiff admits that Dr. Mustafa found her to be moderately-to-severely depressed but disputes that she was.  Rene Aff., ¶ 2; 29; 46; Stastny Decl., ¶¶ 19-34.

STATEMENT

93.     Prior to seeing RENE, MUSTAFA read portions of the hospital chart pertaining to RENE, including the notes in the Emergency Department, Thomas Finding's 15:00 note and the 16:47 case management note (Exhibit "L", p. 43-44, 49).

RESPONSE

93.     The plaintiff admits that contents of paragraph ninety-three accuratrely reflect Dr. Mustafa's testimony.

STATEMENT

94.     On 7/24/15 at approximately 22:19, MUSTAFA documented in the Stony Brook

27

chart that RENE presented to the Medical Emergency Room with depression and suicidal ideation (Exhibit "U", p. 37).

RESPONSE

94.    The plaintiff admits fact statement ninety-four but denies she suffered from depression and manifested suicidal ideation.  Rene Aff., ¶¶ 2; 24-25; 29; 35; 46; Stastny Decl., ¶¶ 19-34.

STATEMENT

95.    RENE acknowledged at her deposition that MUSTAFA had asked RENE about the losses in her life (Exhibit "K", p. 77), but she could not recall any other questions MUSTAFA had asked her (Exhibit "K", p. 79).

RESPONSE

95.    The plaintiff disputes fact statement ninety-five.  Declaration of William Brooks dated September 15, 2020 ("Brooks Decl., Exh. A) at 77-78.

STATEMENT

96.    MUSTAFA used medical judgment to determine whether a patient such as RENE needed involuntary hospitalization (Exhibit "L", p. 19-20).

RESPONSE

96.    The plaintiff admits fact statement ninety-six but asserts Dr. Mustafa's judgment deviated significantly from professional standards.  Stastny Decl., ¶¶ 49-63.

STATEMENT

97.    On 7/24/15 at approximately 22:19, MUSTAFA documented in the Stony Brook chart that RENE's ongoing medical problems led to poor sleep, poor appetite, weight loss, hopelessness, worthlessness and recent suicidal ideation (Exhibit "U", p. 37).

28

RESPONSE

97.     The plaintiff admits the contents in paragraph ninety-seven are what Dr. Mustafa documented but disputes that she had feelings of hopelessness and worthlessness and suicidal ideation.  Rene Aff., ¶ 49; 59 ; Brooks Decl. Exh. A at 73.

STATEMENT

98.     On 7/24/15 at approximately 22:19, MUSTAFA cosigned Kadiyala's note (Exhibit "U", p. 37).

RESPONSE

98.     The plaintiff admits fact statement ninety-eight.

STATEMENT

99.     Based upon the symptoms as reported in the Stony Brook chart, MUSTAFA concluded that the RENE's depression had gotten so severe that she was not able to use her coping skills, that she felt hopeless, worthless and helpless; she was missing work; and she was not able to have sex with her husband (Exhibit "L", p. 98-99).

RESPONSE

99.     The plaintiff admits that Dr. Mustafa reached conclusions set forth in paragraph ninety-nine.  However, the plaintiff asserts that she never felt hopeless, worthless and helpless, was not missing work for any meaningful period of time and was able to have sex with her husband. Rene Aff., ¶ 59; 60; Brooks Decl. Exh. B at 112.

STATEMENT

100.    MUSTAFA had a second meeting with RENE at approximately 8:00 p.m. (Exhibit "L", p. 48).

RESPONSE

100.    The plaintiff disputes fact statement one hundred.  Rene Aff., ¶ 57.

STATEMENT

101.    MUSTAFA's second meeting with RENE lasted about 15 to 20 minutes (Exhibit "L", pp. 46-47).

RESPONSE

101.    The plaintiff disputes fact-statement 101 because she disputes that a second meeting ever took place.  Rene Aff., ¶ 57.

STATEMENT

102.    MUSTAFA had a third meeting with RENE at approximately 10:00 p.m. (Exhibit "L", p. 48).

RESPONSE

102.    The plaintiff disputes fact statement 102.  Rene Aff., ¶ 57.

STATEMENT

103.    MUSTAFA's third meeting with RENE lasted about 10 minutes (Exhibit "L", p. 47).

RESPONSE

103.    The plaintiff disputes fact statement 103.  Rene Aff., ¶ 57.

STATEMENT

104.    MUSTAFA's had a fourth meeting with RENE at approximately 10:30-11:00 p.m. (Exhibit "L", p. 48).

RESPONSE

104.    The plaintiff disputes fact statement 104.  Rene Aff., ¶ 57.

30

STATEMENT

105.    MUSTAFA spoke with the nurse, social worker, social work students and residents, and she read the ED physician's note (Exhibit "L", p. 64).

RESPONSE

105.    The plaintiff neither disputes nor admits fact statement 105.  The plaintiff simply notes that the nurse worked at about 3:00 in the afternoon and Dr. Mustafa did not become involved with this case until Dr. Kadiyala spoke to her about the case at about 9:30.  Hence, a good chance exists that Dr. Mustafa and the social worker did not work at the same time.  Declaration of Gregory Radomisli dated July 16, 2020 ("Radomisli Decl.") Exh. U at 11; 30-31; 36.

STATEMENT

106.    Based on MUSTAFA's meeting with the individuals with whom she met, her assessment of RENE's personal evaluation and her review of the records, MUSTAFA believed that RENE posed a moderate or substantial risk of harm to herself because of the threat of suicide (Exhibit "L", p. 67-68).

RESPONSE

106.    The plaintiff does not dispute that Dr. Mustafa reached the conclusion set forth in paragraph 106 but disputes that she posed any sort of risk.  Stastny Decl., ¶¶ 35-48.

STATEMENT

107.    MUSTAFA determined that RENE posed a substantial risk of harm to herself (Exhibit "L", p. 50).

RESPONSE

107.    The plaintiff does not dispute that Dr. Mustafa reached the conclusion set forth in

paragraph 107 but disputes that she posed a substantial risk of harm.  Stastny Decl., ¶¶ 35-48.

STATEMENT

108.    MUSTAFA determined that RENE posed a substantial risk of harm to herself because she was at risk for suicide (Exhibit "L", p. 50).

RESPONSE

108.    The plaintiff does not dispute that Dr. Mustafa determined that she posed a substantial risk of harm to herself because she was at risk for suicide but denies the accuracy of this conclusion.  Stastny Decl., ¶¶ 35-48.

STATEMENT

109.    MUSTAFA believed RENE posed such a risk because MUSTAFA determined that RENE met all the criteria of a moderate-to-severe depression ongoing for at least three months; she had a history of depression in the past; she had multiple medical issues ongoing at the same time; she had been relentlessly suffering, and experiencing discomfort and pain; had verbalized suicidal thoughts and frustration because of her medical treatment was not successful; and she wanted to take her own life (Exhibit "L", p. 68-69).

RESPONSE

109.    The plaintiff does not dispute that what is set forth in paragraph 109 is what defendant Mustafa believed but disputes the accuracy of the findings of these findings.  Rene Aff., ¶¶ 2; 24-25; 29; 35; 44; 46; J. Rene Aff., ¶¶ 3; 8; Calleja Aff., ¶¶ 4-5; D'Esposito Decl., ¶¶ 4-7; Stastny Decl., ¶¶ 35-48.

STATEMENT

110.    MUSTAFA used medical judgment to determine whether a patient such as RENE needed involuntary hospitalization (Exhibit "L", p. 19-20).

32

RESPONSE

110.    The plaintiff does not dispute that Dr. Mustafa exercised medical judgment but asserts that the judgment deviated substantially from professional standards.  Stastny Decl., ¶¶ 49-63.

STATEMENT

111.    Pursuant to Mental Hygiene Law § 9.37, MUSTAFA authorized the director of a hospital, in this case Brunswick Hospital, to receive RENE for care on the ground that RENE had a mental illness for which immediate care in a hospital was appropriate and she was likely to result in serious harm to herself (Exhibit "H").

RESPONSE

111.    The plaintiff does not dispute fact statement 111, although she disputes that she had a mental illness for which immediate care in a hospital was appropriate and she was likely to result in serious harm to herself.  Stastny Decl., ¶¶ 19-48.

STATEMENT

112.    MUSTAFA and Kadiyala identified the facts and circumstances upon which MUSTAFA based her determination that RENE might be dangerous (Exhibit "Q" p. 62-65, 66-67).

RESPONSE

112.    The plaintiff does not dispute fact statement 112 but disputes the accuracy of the facts supporting the determination and the validity of the underlying justification relied upon by Dr. Mustafa for the determination that she made.  Stastny Decl., ¶¶19-63; Rene Aff., ¶¶ 24-61.

STATEMENT

113.   A doctor could reasonably concluded that RENE had recurrent thoughts of death, recurrent thoughts of suicidal ideation without a specific plan (Exhibit "Q", p. 100, p. 101).

RESPONSE

113.   The plaintiff disputes fact statement 113.  In the context of the question and response given by the plaintiff's expert acknowledged that a doctor looking at particular symptoms could conclude they amounted to recurrent thoughts of death and recurrent thoughts of suicidal ideation without a specific plan, but the plaintiff denied making the statements that the question posed assumed that she had made.  The question assumed that a hypothetical patient made such statements.  The question further assumes that this hypothetical doctor acted reasonably in gathering information, which the plaintiff asserts defendant Mustafa did not do.  Radomisli Decl., Exh. Q at 100-101.; Stastny Decl., ¶¶ 19-34; 45-46; 49-63.

STATEMENT

114.   A doctor could reasonably concluded that RENE met the criteria for depression (Exhibit "Q", p. 101).

RESPONSE

114.   For the reasons given in the response to fact statement 113, the plaintiff disputes fact statement 114.  Stastny Decl., ¶¶ 19-34; 45-46; 49-63.

STATEMENT

115.   Determining whether someone presents a substantial risk of harm to oneself is a clinical judgment (Exhibit "Q", p. 102-103).

RESPONSE

34

115.   The plaintiff does not dispute fact statement 115 but asserts also that it is also a legal judgment.

STATEMENT

116.   MUSTAFA made a clinical judgment that the plaintiff represented a substantial risk of harm to herself (Exhibit "Q" p. 103).

RESPONSE

116.   The plaintiff does not dispute fact statement 116 but asserts that the judgment significant deviated from professional standards.  Stastny Decl., ¶¶ 49-63.

STATEMENT

117.   MUSTAFA made an assessment, pulled everything together and rendered a conclusion (Exhibit "Q", p. 104-105).

RESPONSE

117.   The plaintiff does not dispute fact statement 117 although notes that the process in which she pulled everything together significantly deviated from professional standards. Stastny Decl., ¶¶ 49-63.  The plaintiff further asserts that a question of fact exists as whether Dr. Mustafa pulled everything together prior to meeting the plaintiff. *See infra.* ¶¶ 220-221.

STATEMENT

118.   MUSTAFA pulled the risk factors together, the mitigating factors together, and rendered a conclusion (Exhibit "Q" p. 105).

RESPONSE

118.   The plaintiff does not dispute fact statement 118, although notes that the process in which she pulled everything together significantly deviated from professional standards.  Stastny Decl., ¶¶ 49-63.

35

STATEMENT

119.   MUSTAFA did not decide to have RENE hospitalized, but did decide to have

her transported to BRUNSWICK (Exhibit "Q", p. 106).

RESPONSE

119.   The plaintiff does not dispute fact statement 119.

STATEMENT

120.   If MUSTAFA's testimony that she believed she met RENEE three or four times

for at least 30 to 45 minutes, again for 15 to 20 minutes and again for 10 minutes was

accurate, then she met the standard of care for the duration of the encounter (Exhibit "Q", p.

107).

RESPONSE

120.   The plaintiff does not dispute fact statement 120, but notes, as stated

previously, she disputes that Dr. Mustafa met with her four times.  Rene Aff., ¶ 57.

STATEMENT

121.   Thoughts of wanting to jump off a bridge are suicidal thoughts (Exhibit "Q", p.

126).

RESPONSE

121.   The plaintiff does not dispute fact statement 121.

STATEMENT

122.   Thoughts of wanting to leave this earth are passive suicidal thoughts (Exhibit

"Q" p. 126).

RESPONSE

122.   The plaintiff does not dispute fact statement 122.

STATEMENT

123.    According to the chart, RENE expressed suicidal thoughts (Exhibit "Q", p. 127).

RESPONSE

123.    The plaintiff does not dispute fact statement 123 but disputes that she expressed suicidal thoughts and disputes the accuracy of the information in the chart.  Rene Aff., ¶ 24-25; 35; 50.

STATEMENT

124.    A physician in a hospital can use the information gathered by other personnel in the hospital in conjunction with their own assessment if they are the ones who are authorized to fill out the MHL forms such as 9.37 (Exhibit "Q", p. 129).

RESPONSE

124.    The plaintiff does not dispute fact statement 124.

STATEMENT

125.    Part of the determination as to whether a patient meets the criteria pursuant to 9.37 is a clinical medical judgment (p. 129) (or, clinical medical judgment is part of the determination as to whether the patient meets 9.37 criteria) (Exhibit "Q" p. 129).

RESPONSE

125.    The plaintiff does not dispute fact statement 125.

STATEMENT

126.    MUSTAFA's decisions were not "plainly incompetent" (Exhibit "Q", p. 134-136).

RESPONSE

126.    The plaintiff disputes fact statement 126.  This statement refers to testimony of the plaintiff's expert.  This expert simply stated is not language that he would use to describe the care provided by Dr. Mustafa and never testified as to whether he believed Dr. Mustafa's actions in this case were or were not plainly incompetent.  It should be further noted that the plaintiff's expert interpreted this question as asking him whether or not Dr. Mustafa was a competent doctor and  he stated that he could not make this assessment based on this one case alone.  Radomisli Decl., Exh. Q at 134-136.

STATEMENT

127.    After MUSTAFA authorized the plaintiff to be transported to Brunswick Hospital, ONUOGU could have decided not to hospitalize RENE (Exhibit "Q", p. 154).

RESPONSE

127.    The plaintiff does not dispute fact statement 127.

STATEMENT

128.    ONUOGU came to his own conclusions, which were consistent with MUSTAFA's (Exhibit "Q" p. 186).

RESPONSE

128.    The plaintiff does not dispute fact statement 128, although the plaintiff asserts that like Dr. Mustafa, Dr, Onuogu significantly deviated from professional standards when reaching this conclusion.  Stastny Decl., ¶¶ 49-63.

STATEMENT

129.    "I had thoughts of leaving this earth" would be considered suicidal ideation (Exhibit "Q", p. 192).

RESPONSE

129.    The plaintiff does not dispute fact statement 129, although the plaintiff disputes

that she made such a statement.  Rene Aff., ¶ 25.

STATEMENT

130.    When RENE said she wanted to take her life as a result of these symptoms, it

was suicidal ideation, and possibly intent (Exhibit "Q", p. 291).

RESPONSE

130.    The plaintiff disputes fact statement 130 to the extent that she never said that

she wanted to take her life.  Rene Aff., ¶¶ 24-25; 35.

STATEMENT

131.    According to Section 9.37 of the Mental Hygiene Law, the Director of

Community Services can make a recommendation that a patient be admitted to the hospital for

psychiatric care, but an independent psychiatrist has to agree or disagree with that assessment

within 24 hours (Exhibit "N", p. 26).

RESPONSE

131.    The plaintiff does not dispute fact statement 131.

STATEMENT

132.    Before admitting a patient involuntarily, the patient would have to meet the

criteria of the statute under which the patient was being admitted (Exhibit "N", p. 32).

RESPONSE

132.    The plaintiff does not dispute fact statement 132.

STATEMENT

133.   According to Section 9.37 of the Mental Hygiene law, after the admitting doctor certifies a patient for hospitalization, another physician at the hospital within 72 hours must also certify that the patient meets the criteria for involuntary admission (Exhibit "N", p. 36).

RESPONSE

133.   The plaintiff does not dispute fact statement 133.

STATEMENT

134.   ONUOGU conducted a personal evaluation of RENE, including a face-to-face interview (Exhibit "N" p. 39).

RESPONSE

134.   The plaintiff does not dispute fact statement 134 to the extent that she concedes that Dr. Onuugu met with her.  However, the plaintiff asserts that any evaluation conducted by Dr. Onuogu substantially deviated from professional standards.  Stastny Aff., ¶¶ 46; 49-63.

STATEMENT

135.   When ONUOGU asked RENE why she was in the hospital, she said she had come in for depression (Exhibit "N", p. 55).

RESPONSE

135.   The plaintiff disputes fact statement 135.  Rene Aff., ¶ 78.

STATEMENT

136.   ONUOGU will not look at the records that come with the patient before doing a face-to-face interview so that he can generate his own impression before reviewing the records (Exhibit "N", p. 92).

RESPONSE

136.    The plaintiff does not dispute that the content of paragraph 136 accurately describes Dr. Onuugu's deposition testimony.  However, the plaintiff asserts that when she entered the room to meet with Dr. Onuugu, he had a book opened that looked like her chart and was writing information in it before he introduced himself to the plaintiff.  Rene Aff., ¶¶ 68-70.

STATEMENT

137.    At the time ONUOGU evaluated RENE, it was his practice to first conduct a face-to-face interview with her, and then evaluate any records that came from Stony Brook Exhibit "N", p. 92-93).

RESPONSE

137.    The plaintiff neither disputes nor concedes paragraph 137.  Rather, she asserts that in this case, Dr. Onuogu had clearly read material related to her as what looked like her chart was open and he was making an entry in it.  Rene Aff., ¶¶ 68-70.

STATEMENT

138.    ONUOGU determined that RENE suffered from major depressive disorder (Exhibit "N", p. 101-102).

RESPONSE

138.    The plaintiff does not dispute that Dr. Onuogu determined that she suffered from major depressive disorder but disputes that she suffered from a major depressive disorder. Rene Aff., ¶ 2; 29; 46; Stastny Decl. ¶¶ 19-34.

STATEMENT

139.    ONUOGU determined that RENE posed a danger to herself because she was suicidal (Exhibit "N", p. 108).

RESPONSE

139.   The plaintiff does not dispute that Dr. Onuogu determined that she posed a danger to herself but disputes the accuracy of this conclusion.  Stastny Decl., ¶¶ 35-46.

STATEMENT

140.   At or around 11:50 p.m. on July 25, 2105, ONUOGU authorized confirmed the need for immediate hospitalization pursuant to Mental Hygiene Law §9.37 and formally authorized RENE's admission to Brunswick (Exhibit "H").

RESPONSE

140.   The plaintiff does not dispute fact statement 140.

STATEMENT

141.   On July 27, 2105, SIAL determined that as a result of mental illness RENE posed a danger to herself or others and certified RENE for continued hospitalization pursuant to Mental Hygiene Law §9.37 (Exhibit "H").

RESPONSE

141.   The plaintiff does not dispute that Dr. Sial determined that she posed a danger to herself but disputes the accuracy of this conclusion.  Stastny Decl., ¶¶ 35-48.

STATEMENT

142.   RENE told SIAL that she felt hopeless (Exhibit "P", p. 25).

RESPONSE

142.   The plaintiff disputes fact statement 142.  Rene Aff., ¶ 83.

STATEMENT

143.   RENE told SIAL that she felt helpless (Exhibit "P", p. 26).

RESPONSE

143.    The plaintiff disputes fact statement 143.  Rene Aff., ¶ 83.

STATEMENT

144.    SIAL concluded that RENE suffered from a depressed mood most of the day,

nearly every day (Exhibit "P", p. 32).

RESPONSE

144.    The plaintiff does not dispute that paragraph 144 accurately describes Dr. Sial's

testimony but disputes that she suffered from a depressed mood most of the day, nearly every

day.  Rene Aff., ¶¶ 2; 28; 46; J. Rene Aff., ¶¶ 3; 8; Calleja Aff., ¶ 4; K. D'Esposito Decl., ¶ 7.

Stastny Decl., ¶¶ 23.

STATEMENT

145.    RENE told SIAL that suicidal thoughts had crossed her mind (Exhibit "P", p. 32-

33).

RESPONSE

145.    The plaintiff denies fact statement 145.  Rene Aff., ¶ 80.

STATEMENT

146.    RENE told SIAL she had been depressed for quite a good many, many months,

and she was losing interest in almost everything (Exhibit "P", p. 36).

RESPONSE

146.    The plaintiff denies fact statement 146.  Rene Aff., ¶ 83.

STATEMENT

147.    SIAL concluded that RENE had insomnia or hypersomnia every day (Exhibit

"P", p. 40).

RESPONSE

147.   The plaintiff does not dispute the Dr. Sial concluded that she had insomnia or hypersomnia every day but disputes the accuracy of this conclusion.  Rene Aff., ¶¶ 13; 19.

STATEMENT

148.   SIAL concluded that RENE suffered from psychomotor retardation nearly every day (Exhibit "P", p. 41).

RESPONSE

148.   The plaintiff does not dispute that Dr. Sial concluded that she suffered psychomotor retardation every day but disputes the underlying basis for her conclusion.  Rene Aff., ¶ 85.

STATEMENT

149.   SIAL concluded that RENE had fatigue or loss of energy nearly every day based on the history that she pushes herself to work and then comes home and goes to bed (Exhibit "P", p. 43).

RESPONSE

149.   The plaintiff does not dispute that Dr. Sial reached the conclusion set forth in paragraph 149 but disputes the underlying bases for her conclusion.  Rene Aff., ¶¶10-11; Brooks Exh., A at 130-131; J. Rene Aff., ¶6.

STATEMENT

150.   SIAL concluded that RENE had feelings of worthlessness (Exhibit "P", p. 44).

RESPONSE

150.   The plaintiff does not dispute that Dr. Sial reached the conclusion set forth in paragraph 150 but disputes the accuracy of the conclusion.  Brooks Decl., Exh. A at 130: Rene

44

Aff., ¶ 59.

STATEMENT

151.    SIAL concluded that RENE had a diminished ability to think or to concentrate or indecisiveness nearly every day (Exhibit "P", p. 45).

RESPONSE

151.    The plaintiff denies fact statement 151.  Rene Aff., ¶ 85.

STATEMENT

152.    SIAL concluded that RENE's symptoms caused P clinically significant distress or impairment in social functioning (Exhibit "P", p. 46).

RESPONSE

152.    The plaintiff does not dispute that Dr. Sial concluded that Ms. Rene's symptoms caused her clinical distress or impairment in social functioning but disputes the accuracy of this conclusion.  Rene Aff., ¶ 10; J. Rene Aff., ¶7; Calleja Aff., ¶ 5

STATEMENT

153.    SIAL concluded that RENE's symptoms caused significant distress or impairment in occupational functioning because she had no interest in her work, was pushing herself to go there, going home and going straight to bed without any sleep (Exhibit "P", p. 47).

RESPONSE

153.    The plaintiff does not dispute that Dr. Sial reached the conclusion set forth in paragraph 153 but denies the accuracy of this conclusion.  Brooks Decl., Exh. A at 131; Rene Aff., ¶ 10; Brooks Decl., Exh. C at 78; 87-91D'Esposito Decl., ¶ 6.

STATEMENT

154.    SIAL concluded that RENE's symptoms caused clinically significant distress or impairment in other important areas of functioning (Exhibit "P", p. 48).

RESPONSE

154.    The plaintiff does not dispute that Dr. Sial reached the conclusion set forth in paragraph 154, but denies the accuracy of this conclusion.  Brooks Decl., Exh. A at 131; Rene Aff., ¶¶ 10; 12; 14; Stastny Decl., ¶ 31.

STATEMENT

155.    SIAL concluded that RENE's symptoms were not due to direct physiological effects of a substance or a general medical condition because she was medically stable, and urine toxicology was negative (Exhibit "P", p. 49).

RESPONSE

155.    The plaintiff does not dispute fact statement 144 but for reasons set forth above, disputes that she manifested the symptoms that Dr. Sial concluded that she did.  She further asserts that her behaviors that were interpreted as symptoms resulted from a general medical condition and quite possibly physiological effects of a medication .  Rene Aff., ¶¶ 18-21; Brooks Decl., Exh. H at 86-88; Stastny Decl., ¶¶ 31; 33.

STATEMENT

156.    At the initial evaluation, RENE expressed vague suicidal ideation (Exhibit "P", p. 55).

RESPONSE

156.    The plaintiff disputes fact statement 156.  Rene Aff., ¶ 50; 80.

46

STATEMENT

157.    SIAL believed that, at the time of admission, RENE posed a risk of suicide

(Exhibit "P", p. 81).

RESPONSE

157.    The plaintiff does not dispute that Dr. Sial concluded that she posed a risk of

suicide at the time of admission, but disputes the accuracy of the conclusion.  Rene Aff., ¶¶

35; 50; 80; Stastny Decl., ¶¶ 35-47.

STATEMENT

158.    At time of admission, SIAL found that RENE posed a substantial threat of

harm to herself because she was suicidal (Exhibit "P", p. 85).

RESPONSE

158.    The plaintiff does not dispute that Dr. Sial believed that she posed a substantial

risk of harm because of suicide, but disputes the accuracy of the conclusion.  Rene Aff., ¶¶

35; 50; 81: Stastny Decl., ¶¶ 35-47.

STATEMENT

159.    SIAL's clinical judgment was that RENE was a danger to herself on 7/26/15

because he assessed her as feeling depression, suffering from psychosocial stresses, losses,

medical issues (Exhibit "P", p. 114).

RESPONSE

159.    The plaintiff does not dispute that Dr. Sial reached the conclusion set forth in

paragraph 159, but disputes the accuracy of the conclusion and the accuracy of the underlying

bases for this conclusion.  Rene Aff., ¶¶ 2; 29; 46; 83; Stastny Decl., ¶¶ 19-48.

STATEMENT

160.   In his report, Dr. Statsny does not establish what the standard of care was in this case (Exhibit "Q, p. 31).

RESPONSE

160.   The plaintiff disputes fact statement 160.  Brooks Decl., Exh. H at 31-32.

STATEMENT

161.   MUSTAFA never hospitalized the plaintiff (Exhibit "Q", p. 54).

RESPONSE

161.   The plaintiff does not dispute fact statement 161.

STATEMENT

162.   Unless ONUOGU made his own determination that the patient needed to be hospitalized, the plaintiff would not have been hospitalized (Exhibit "Q", p. 55).

RESPONSE

162.   The plaintiff does not dispute fact statement 162.

Pursuant to Local Rule 56.1, the plaintiff asserts the following facts are in dispute:

163.   When Ms. Rene suffered significant losses in her life, specifically the deaths of her fiancé, her first husband and her sister, these deaths did not adversely impact her in any significant and prolonged way, and did not adversely affect her mental health.  Brooks Decl., Exh. D at 64-65; 72-77; 120; Exh. N. at 17; 44-45; Ca;lleja Aff., ¶ 2.

164.   When Ms. Rene suffered significant losses in her life, specifically the deaths of her fiancé, her first husband and her sister, she went through a normal grieving period and then moved on with her life in a healthy fashion, with the deaths causing no long-term harm with Ms. Rene's mental health.  Rene Aff., ¶¶ 3-5;  Brooks Decl., Exh. D at 64-65; 72; *infra ,*

¶¶ 165-167.

165.    Dolores Calleja is Ms. Rene's best friend.  Brooks Decl., Exh. E at 17.

166.    When Ms. Rene's sister died, Ms. Calleja, observed Ms. Rene multiple times and concluded that she reacted in a strong manner.  Brooks Exh. E at 29; Calleja Aff., ¶ 2.

167.    When Ms. Rene's sister died, her daughter observed that Ms. Rene grieved immediately after the loss but did not manifest any other change in behavior.  Brooks Decl., Exh. F at 65-66.

168.    To the best of the knowledge of Ms. Rene's daughter, Ms. Rene took her daughter to a bereavement class but did not attend one herself.  Brooks Decl., Exh. F at 59-60.

169.    According to Ms. Calleja, Ms. Rene did not seek counseling when Ms. Rene's fiancé died.  Brooks Decl., Exh. E at 20-21.

170.    Ms. Rene loves sports and from March, 2015 through July, 2015, Ms. Calleja did not observe the plaintiff to have an interest in watching baseball.  Brooks Decl., Exh. D at 78; Exh. E at 39.

171.    Ms. Rene and Ms. Calleja enjoyed going on walks and having dinner together. Brooks Decl., Exh. E at 20.

172.    At no time between March, 2015 through July 2015 did Ms. Rene appear to Ms. Calleja to be less interested in going on walks or going out to dinner. Brooks Decl., Exh. D at 40.

173.    Between March, 2015 and July, 2015, Ms. Calleja did not observe and was otherwise unaware of any change in Ms. Rene's interests.  Brooks Exh. E at 40.

174.    At no time in the course of their friendship, including in 2015 did Ms. Rene express to Ms. Calleja that she felt hopeless or helpless.  Brooks Decl., Exh. at 41

175.   At no time did Ms. Rene express to her mother that she felt hopeless or helpless.  Brooks Decl., Exh. E at 87.

176.   During the period in which Ms. Rene suffered from a gland problem, she appeared frustrated to her boss but the health issues did not impact Ms. Rene's job performance.  Brooks Decl., Exh. C at 7-9; 20; D'Esposito Aff., ¶¶ 5-6.

177.   During the period in which Ms. Rene suffered from a gland problem, she did not appear to her boss to be depressed.  Brooks Decl., Exh. C at 21-24; D'Esposito Decl., 7.

178.   During the period in which Ms. Rene suffered from a gland problem, her boss did not observe her to have a loss of appetite, although her boss understood that food did not taste as good to Ms. Rene. Brooks Decl., Exh. C at 24.

179.   During the period in which Ms. Rene suffered from a gland problem, her boss could not recall Ms. Rene telling her that she had not slept for more than two hours a night. Brooks Decl., Exh. C at 25.

180.   During the period in which Ms. Rene suffered from a gland problem, her boss could not recall Ms. Rene telling her that she was not enjoying life.  Brooks Decl., Exh. C at 25.

181.   Ms. Rene's boss believes that if Ms. Rene told her she was not enjoying life and she had not been able to sleep more than two hours a night for three months, these statements would have stuck in her boss' memory.  Brooks Exh. C at 27.

182.   Ms. Rene's boss could not recall any loss in the plaintiff's productivity as an employee from January 2015 through July, 2015.  Brooks Decl., Exh. C at 73; D'Esposito Aff., ¶ 5

183.   Ms. Rene's boss could not recall having concerns about Ms. Rene's work

performance, her ability to cope, and her ability to function at her job.  Brooks Exh. C at 87-88; 90-91.

184.    Ms. Rene's boss would have recalled if Ms. Rene had difficulties at work. Brooks Decl., Exh. C at 90-91.

185.    Ms. Rene's boss could not recall during the period in which she was suffering from a gland problem that Ms. Rene appeared sad or depressed.  Brooks Decl., Exh. C at 76; 89.

186.    If Ms. Rene appeared depressed, it is something that her boss would remember. Brooks Decl., Exh. C at 90.

187.    Ms. Rene's boss could not recall during the period in which she was suffering from a gland problem that Ms. Rene appeared tired.  Exh. C at 78.

188.    Ms. Rene's boss never witnessed behavior from the plaintiff that would require psychiatric hospitalization.  Brooks Decl., Exh. C at 86.

189.    Ms. Rene is a religious person.  Rene Aff., ¶ 6; Brooks Decl., Exh. E at 21.

190.    There was never a time since Ms.  Rene was married to her present husband during which she was less interested in meeting with her friends than at other times.  Brooks Decl., Exh. B at 22-23.

191.    At no time during her present marriage, did Ms. Rene exhibit signs of depression; she has always been very upbeat.  *Id.*, at 29.

192.    Ms. Rene has always been, and was in 2015, a person who believed things were going to get better; she has always been optimistic.  *Id.*, at 132.

193.    At no time from March, 2015 through July, 2015 did Ms. Rene come home from work and go straight to bed.  *Id.,* at 48; 112.

194.   At no time from March, 2015 through July, 2015, did Ms. Rene ever complain to her husband that she was tired, appeared tired to her husband, or complain that she was not getting enough sleep.  *Id.* at 47-48.

195.   Once Ms. Rene started experiencing a poor taste in her moth, there was no change in her social life.  *Id.* at 48.

196.   At no time from March 2015 through July 2015, did Ms. Rene's husband notice a decrease in her weight.  *Id.,* at 54.

197.   At no point between March, 2015 through July, 2015, did Ms. Rene's husband notice a decrease in the amount of sleep that Ms. Rene was getting.  *Id.,* at  48.

198.   At no time did Ms. Rene express to her present husband that she felt that she was a burden to her family.  *Id.* at 80.

199.   At no time did Ms. Rene express to her present husband words to the effect of that she wanted to leave this earth.  *Id.* at 80.

200.   From March through July, 2015, Ms. Rene and her husband continued to engage in sexual relations.  *Id.* at 112.

201.   At no time from March, 2015 through July 2015, did the plaintiff's mother observe the plaintiff come home from work and go straight to bed or otherwise have a change in her routine.  Brooks Decl., Exh. D at 79; 81-84.

202.   Ms. Rene never made a suicide threat or expressed suicide ideation in the emergency department of Stony Brook on July 24, 2015.  Rene Aff., ¶ 24-25.

203.   Ms. Rene never told nurse Thomas Fining that "I lost my zest for life."  Rene Aff., ¶ 30.

204.   Ms. Rene never felt lonely.  *Id.,* ¶ 32.

52

205. Ms. Rene had numerous close relationships and they existed as of July, 2015. *Id.,* ¶ 33.

206. Ms. Rene never had suicide thought or intent in her life. This includes no thoughts of dying or a wish to be dead. *Id.,* ¶¶ 35; 50.

207. Ms. Rene did not have a history of depression. *Id.,* ¶ 2; 29; 44; 46.

207. Because the contents of paragraphs 202 through 208 conflict with entries made by Thomas Fining, Mr. Fining made many inaccurate entries in Ms. Rene's Stony Brook chart. *Id.,* ¶¶ 2; 6; 2 4-25; 29; 30; 32; 33; 35; 44; 46; 50.

208. Ms. Rene never told social work Kristy Graziano that she was getting two hours of sleep per night. *Id.,* ¶ 38.

209. Ms. Rene never told Ms. Graziano that her fiancé died when she was twenty-seven, her first husband died in 2008 and she lost her sister two years ago (from the time of their interview). Her fiancé died when she was twenty-nine, her first husband died in 2003 and her sister died three years prior to her evaluation at Stony Brook. *Id.*, at 40.

210. Ms. Rene never acknowledged to Ms. Graziano that she said "I want to leave this earth. *Id.,* ¶ 41.

211. Ms. Rene never said to Ms. Graziano that she saw a therapist for grief in 1989, then again in 2004. Ms. Rene's losses occurred in different years as follows: her fiancé died in 1992; her first husband died in 2003; and, her sister died in 2012. *Id.,* ¶ 42.

212. Ms. Graziano made a number of inaccurate entries in Ms. Rene's chart even though she placed the information in quotation marks as to reflect that she was transcribing what Ms. Rene said. *Supra,* ¶¶ 208-211.

213. Ms. Rene never told Dr. Kadiyala that she was depressed and not enjoying life.

*Id.,* ¶ 44.

214.    Throughout her physical ordeal produced by her glandular problem, Ms. Rene remained upbeat.  *Id.,* ¶ 46; Brooks Exh. B at 29; J. Rene Aff., ¶¶3; 5.

215.     Ms. Rene never told Dr. Kadiyala that she was sleeping two hours a night for three months, isolating herself, coming home and hitting the bed without sleep and had bad thoughts about the past.  Rene Aff. ¶ 48.

216.    Ms. Rene never acknowledged to Dr. Kadiyala that she felt helpless and hopeless.  *Id.,* ¶ 49.

216.    Ms. Rene never acknowledged to Dr. Kadiyala that she had thoughts of hurting herself that crossed her mind.  *Id.,* ¶ 50.

217.    Ms. Rene never told Dr. Kadiyala or Dr. Mustafa that she was not enjoying life.  *Id.,* ¶51.

218.    Ms. Rene never acknowledged to Dr. Kadiyala that she had told her primary care provider two months previously that she had thoughts of jumping off a bridge.  *Id.,* 52.

219.    Dr. Kadiyala documented that Ms. Rene agreed with a decision to transfer her to a hospital for inpatient hospitalization when Ms. Rene vehemently opposed this course of action.  Radomisli Decl., Exh. U at 30-31; Rene Aff., ¶ 53.

220.    For the reasons set forth in paragraphs 213 to 219, Dr. Kadiyala made numerous entries that contained significant errors.  *Supra* 213-219.

220.    By 9:32 on July 24, 2015, a decision had been made to involuntarily admit Ms. Rene to an inpatient facility. Brooks Decl., Exh. M at 36.

221.    Dr. Mustafa met with the patient after 10:00.  Rene Aff., ¶ 55.

222.    This was the only meeting between Dr. Mustafa and Ms. Rene.  *Id.,* 57.

223.    Dr. Mustafa based her decision to authorize the involuntary detainment of Ms. Rene pursuant to Mental Hygiene Law § 9.37 on the ground *inter alia,* that Ms. Rene suffered from depression.  Brooks Decl., Exh. N at 99.

223.    Dr. Mustafa believed that two months before her evaluation, Ms. Rene wanted to jump off a bridge.  *Id.,* at 97.

224.    Ms. Rene did not pose a substantial threat of harm to herself at the time of her evaluation at Stony Brook.  Stastny Decl., ¶ 35-48.

225.    No objectively reasonable basis existed for Dr. Mustafa to believe that Ms. Rene posed a substantial threat of harm to herself.  Stastny Decl., ¶ 39.

226.    Ms. Rene did not have a history of depression in the past.  Rene Aff., ¶¶ 2; 29; 44; 46.

227.    Ms. Rene did not suffer from a depressive disorder.  Stastny Decl., ¶¶ 19-34.

228.    By diagnosing Ms. Rene as suffering from a major depressive episode, Dr. Mustafa substantially departed from professional standards.  Stastny Decl., ¶ 34.

229.    Dr. Mustafa further substantially departed from professional standards by the manner in which she conducted her psychiatric evaluation of Ms. Rene and reached her conclusion that Ms. Rene posed a substantial threat of harm to herself and otherwise required

inpatient hospitalization.  Stastny Decl., ¶¶ 49-63.

Dated: Central Islip, New York
      September 16, 2020

                                          BARRY SEIDEL
                                          BS7112
                                          148-55 Hillside Avenue
                                          Jamaica, New York 11435
                                          (718) 793-1133
                                          By:

                                          William M. Brooks, Of Counsel
                                        WB 1544