UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------x
DIANA RENE,

                       Plaintiff,          <u>MEMORANDUM & ORDER</u>
                                        No. 16-CV-4072(JS)(ST)

    -against-

TANZIA MUSTAFA, M.D., personally;
EJIKE ONUOGU, M.D., personally;
TAHIRA N. SIAL, M.D., personally;
BRUNSWICK HOSPITAL CENTER, INC.,

                       Defendants.
--------------------------------x
Appearances:

For Plaintiff:      William M. Brooks, Esq., Of Counsel
                    Barry Seidel and Associates
                    148-55 Hillside Avenue
                    Jamaica, New York  11435

For Defendant       Gregory J. Radomisli, Esq.
Mustafa:           Martin Clearwater & Bell LLP
                    220 East 42nd Street
                    New York, New York  10017

For the           Amy E. Bedell, Esq.
Hospital          Lewis Johs Avallone Aviles, LLP
Defendants:       One CA Plaza, Suite 225
                    Islandia, New York  11749

SEYBERT, District Judge:

         Before the Court in this Section 1983 civil rights action

arising out of the detention-for-transport of Plaintiff Diana Rene

("Plaintiff") at Stony Brook University Medical Center and her

subsequent involuntary confinement at Brunswick Hospital Center

are two summary judgment motions: one brought by Defendant Tanzia

Mustafa, M.D. ("Mustafa") (hereafter, the "Mustafa Motion") (see

ECF No. 116[1]); and one brought by Defendants Ejike Onuogu, M.D. ("Onuogu"), Tahira N. Sial, M.D. ("Sial"), and Brunswick Hospital Center, Inc. ("Brunswick" or "Hospital"; collectively with Onuogu and Sial, the "Hospital Defendants") (hereafter, the "Hospital Motion") (see ECF No. 120[2]).  For the reasons that follow, the Mustafa Motion is GRANTED, and the Hospital Motion is GRANTED.


[Remainder of page intentionally left blank.]


---

[1]  See also Mustafa Support Memo (hereafter, "M-Support Memo") (ECF No. 118), and Reply (hereafter, "M-Reply") (ECF No. 138). Plaintiff has filed an omnibus Opposition (hereafter, "Opposition" or "Opp'n") to Mustafa's Motion and the Hospital's Motion.  (See Opp'n, ECF No. 137.)

[2]  See also Hospital Support Memo (hereafter, "H-Support Memo") (ECF No. 120-1), and Reply (hereafter, "H-Reply") (ECF No. 139). As noted, supra at note 1, Plaintiff has filed an omnibus Opposition to Mustafa's and the Hospital's respective Motions.

BACKGROUND

I.   Relevant Factual Background[3]

---

[3] Unless otherwise stated, the factual background is derived from the parties' Local Civil Rule 56.1 Statements. Mustafa's Rule 56.1 Statement (see ECF No. 119) shall be cited as "M-56.1 Stmt." Plaintiff's Counterstatement to Mustafa's Rule 56.1 Statement (see ECF No. 125) shall be cited as "P-M 56.1 Counter." The Hospital's Rule 56.1 Statement (see ECF No. 120-24) shall be cited as "H-56.1 Stmt." Plaintiff's Counterstatement to the Hospital's Rule 56.1 Statement (see ECF No. 126) shall be cited as "P-H 56.1 Counter."

Herein, internal quotation marks and citations from these Statements have been omitted. A standalone citation to a Rule 56.1 Statement or Counterstatement denotes the Court has determined the underlying factual allegation is undisputed. Further, citation to a party's Rule 56.1 Statement or Counterstatement incorporates by reference the party's citation(s), if any. However, in its discretion, the Court may cite directly to the underlying exhibit(s).

Mustafa's exhibits are identified by letters "A" through "U" (see ECF Nos. 117-1 through 117-22) and are attached to the Declaration of Gregory J. Radomisli, Esq., a member of the law firm of record representing Mustafa (see ECF No. 117). To distinguish Mustafa's exhibits, the Court will cite them as "Ex. M-[letter]".

The Hospital Defendants' exhibits are also identified by letters, but from "A" through "Y" (see ECF Nos. 120-3 through 120-28) and are attached to the Declaration of Amy E. Bedell, Esq., a partner of the law firm of record representing the Hospital Defendants (see ECF No. 120-2). To distinguish the Hospital Defendants' exhibits, the Court will cite them as "Ex. H-[letter]".

Further, Plaintiff has identified her exhibits by letter as well, i.e., letter "A" through "R" (see ECF Nos. 127-1 through 127-25) and are attached to the Declaration of William Brooks, one of Plaintiff's attorneys of record (see ECF No. 127). To distinguish Plaintiff's exhibits, the Court will cite them as "Ex. P-[letter]".

Hereafter and unless otherwise noted, the Court will reference exhibits by their respective letter designations only. Relatedly, as to page citation: Where the notation "ECF p.[x]" is used, the Court cites to the pagination generated by the Court's Electronic Case Filing ("ECF") system; otherwise, page citation is to the internal pagination of the cited document.

A.   <u>Regarding the July 24, 2015 Stony Brook Visit</u>[4]

In 2015, Plaintiff suffered from parotitis, a gland disorder that is very painful. (<u>See</u> Third Am. Compl. ("TAC"), ECF No. 70, Preamble.)  Indeed, '[a]s of July 3rd or 4th, [she] believed there was no end in sight for her pain." (P-M 56.1 Counter. ¶ 20.)  By July 24, 2015, Plaintiff had visited approximately six doctors seeking relief from her symptoms, but to no avail. (<u>Id.</u> ¶ 21.)  Thus, on the morning of July 24, 2015, suffering substantial facial pain due to her gland disorder, as well as dizziness and nausea, Plaintiff went to Emergency Department ("ED") of Stony Brook University Medical Center ("Stony Brook") seeking treatment. (<u>Id.</u> ¶¶ 22-24.)  Among other things, while in the ED, Plaintiff told staff: she did not "know how people live with such pain in the face"; she was not sleeping; her appetite was poor and she did not have an appetite for three weeks; she was not enjoying activities she had previously enjoyed; and, "she worries nonstop and that she feels depressed because she worries that her health issues were not resolving." (<u>Id.</u> ¶¶ 24, 27-28, 30, 33, 35.)  She may have also told the ED doctor and/or staff: she was depressed because treatment for the bad taste in her mouth had been unsuccessful; she had lost six pounds in a

_____

[4]   For this subsection, unless otherwise noted, the facts are derived from Plaintiff's Rule 56.1 Counterstatement (<u>see</u> ECF No. 125), which incorporates Mustafa's statements of fact (<u>see</u> ECF No. 119) and include Plaintiff's responses thereto.

one-week span; she had not slept in the past two weeks; she was not socializing with friends; she goes straight to bed when she gets home; and, for the prior three months, she was experiencing crying episodes.  (Id. ¶¶ 25, 29, 31-34, 36.)  Moreover, the Stony Brook ED doctor documented Plaintiff having "[s]tated that she wants to take her life as a result of [her] symptoms."  (P-H 56.1 Counter. ¶ 41.[5])

        Thereafter, Plaintiff was transferred to Stony Brook's psychiatric emergency room for depression and suicidal ideation.[6]  (P-M 56.1 Counter. ¶ 38.)  Once there, she initially interfaced with a psychiatric nurse who documented Plaintiff stating: the quality of her life had gone down and she had lost her zest for life; she had thoughts of wanting to leave this earth; she did not want to be a burden to others; she had a history of depression; in the month prior to her July 2015 hospitalization, she wished to be dead; and, she felt unsafe.  (Id. ¶¶ 39-43, 48.)  This nurse

---

[5]  While Plaintiff does not deny the Stony Brook ED doctor "documented that [she] wanted to take her life," she "denies that she ever wanted to do so" (P-H Rule 56.1 Counter. ¶ 41 (citing Pl. Aff. ¶¶ 24-25)), which is not a denial that she actually made that statement to the ED doctor.

[6]  The psychiatric emergency room is part of Stony Brook's Comprehensive Psychiatric Emergency Program ("CPEP").  See generally NY Connects: Program SBUH—Comprehensive Psychiatric Emergency Program (CPEP), available at https://www.nyconnects.ny.gov/services/sbuh-comprehensive-psychiatric-emergency-program-cpep-omh-pr-813707155450 (last visited Mar. 21, 2024); (see also, e.g., Bardey Decl., Ex. H-A at ¶ 1).

completed the Columbia Suicide Severity Scale, documenting: Plaintiff's thoughts of wishing to be dead occurred two-to-five times a week in the prior month; Plaintiff was having thoughts of dying; Plaintiff's thoughts of wanting to leave the earth occurred two-to-five times a week; and, Plaintiff's rationale for suicide was to end the pain she was experiencing. (Id. ¶¶ 44-47.) Later, a supervised social work intern[7] reported Plaintiff stating, inter alia: she had not slept in two weeks; she did not feel like engaging in activities she used to enjoy; her symptoms started the previous March; she felt depressed; and, she wanted to leave the earth. (Id. ¶¶ 49-54.)

Thereafter, a Stony Brook psychiatric resident met with Plaintiff; in Plaintiff's chart, he documented Plaintiff reporting: having thoughts of passive suicidal ideation; feeling frustrated and depressed because she was experiencing an ongoing rancid taste in her mouth; not having slept in weeks; not enjoying life; not feeling like answering her home phone; not wanting to socialize with friends; isolating herself; upon coming home from work, going straight to bed, but not being able to sleep; having bad thoughts about past experiences; experiencing poor sleep for approximately three months; having a poor appetite and having lost six pounds in a week; having "crying episodes secondary to hurting

---

[7]  (See P-H 56.1 Counter ¶ 86.)

her family"; experiencing helpless and hopeless ideations; experiencing occasional thoughts of hurting herself; and, previously having told her primary care provider of thoughts of jumping off a bridge. (Id. ¶¶ 55-69.) The resident also spoke with Plaintiff's husband ("Husband"), who reported that, because of the inability to determine what was causing the metallic taste in Plaintiff's mouth, Plaintiff was anxious, depressed and "down in the dumps". (Id. ¶¶ 70-71.) Husband also reported financial issues were contributing to Plaintiff feeling this way. (Id. ¶ 71.) The resident also documented: his impression that Plaintiff suffered from "Depression, NOS[8]" (id. ¶ 72); Plaintiff's "recent or presenting psychiatric symptoms included severe depression, anhedonia, mood lability, severe anxiety and difficulty controlling suicidal thoughts" (id. ¶ 78); Plaintiff had a history of depression (id. ¶ 79); Plaintiff had a number of protective factors suggesting a reduced risk of suicide (id. ¶ 80); and, having weighed Plaintiff's risk factors and protective factors

---

[8] In a medical diagnosis, "NOS" means "not otherwise specified". It "is a subcategory in systems of disease/disorder classification. It is used to note the presence of a condition where the symptoms presented indicate a general diagnosis within a family of disorders (e.g. depressive disorders, anxiety disorders), but don't meet criteria established for specific diagnoses within that family." Mental Health America: Not Otherwise Specified, Other Specified Disorder, Or Unspecified Disorder, available at https://mhanational.org/conditions/not-otherwise-specified-other-specified-disorder-or-unspecified-disorder (last visited Mar. 20, 2024).

(id. ¶ 81).  Afterwards, as recorded in Plaintiff's Stony Brook chart, the resident discussed Plaintiff's case with Mustafa, relaying Plaintiff "was a 51 year old married female with quite a few medical issues ongoing, and that she had presented to the hospital with chest pain" who was very depressed and met all the criteria of major depressive episode with suicidal ideation.  (Id. ¶¶ 82-83; see also id. at ¶¶ 84-85.)  He sought Mustafa's input regarding Plaintiff's case.  (Id. ¶ 83.)

Mustafa consulted Plaintiff's Stony Brook chart and then went with the resident to evaluate Plaintiff and discuss the severity of her symptoms; she spent between 30 and 45 minutes with Plaintiff, at which time Plaintiff was crying.  (Id. ¶¶ 88-90, 93.)  From her interaction with Plaintiff, Mustafa gathered Plaintiff "was very depressed, had suicidal thoughts of death, and posed a danger to herself unless treated."  (Id. ¶ 91.)  Even though Plaintiff denied suicidal ideation at the time, from her mental status exam, Mustafa found Plaintiff to be moderately-to-severely depressed.  (Id. ¶ 92.)  Mustafa also recorded that Plaintiff's "ongoing medical problems led to poor sleep, poor appetite, weight loss, hopelessness, worthlessness and recent suicidal ideation."  (Id. ¶ 97.)  "Based upon the symptoms as reported in the Stony Brook chart, Mustafa concluded that [Plaintiff's] depression had gotten so severe that she was not able to use her coping skills, that she felt hopeless, worthless

and helpless; she was missing work; and she was not able to have sex with her husband." (Id. ¶ 99.)

Later that day, at approximately 8:00 p.m., Mustafa had a second meeting with Plaintiff, which lasted 15-to-20 minutes. (Id. ¶¶ 100-01.)  At approximately 10:00 p.m., Mustafa had a third meeting with Plaintiff, which lasted approximately 10 minutes. (Id. ¶¶ 102-03.)  Sometime between 10:30 p.m. and 11:00 p.m., Mustafa had a fourth meeting with Plaintiff.  (Id. ¶ 104.)

Based upon: (1) having spoken with the nurse, the supervising social worker, social work intern, and the resident (id. ¶ 105); (2) having read Plaintiff's notes from the Stony Brook ED doctor; (3) her view of Plaintiff's Stony Brook chart; and (4) her personal evaluation of Plaintiff, Mustafa concluded Plaintiff posed a moderate or substantial risk of harm to herself.  (Id. ¶¶ 105-07.[9])  This conclusion was based upon Plaintiff's: meeting "all the criteria of a moderate-to-severe depression ongoing for at least three months"; past history of depression; experiencing multiple medical issues simultaneously; "relentlessly suffering and experiencing discomfort and pain"; having verbalized suicidal thoughts and frustration with her unsuccessful medical treatment; and, wanting to take her own life.  (Id. ¶ 109.)  Mustafa's

---

[9]  (See also id. ¶ 124 (undisputed that a hospital physician may rely upon information gathered by other hospital personnel, in conjunction with their own assessment, in authorizing a MHL § 9.37 transport).)

determination was an exercise of her medical judgment, reached after Mustafa met with Plaintiff and weighed Plaintiff's risk factors and mitigating factors, and was the basis for her authorizing Plaintiff's transport to Brunswick pursuant to N.Y.S. Mental Hygiene Law ("MHL") § 9.37.  (Id. ¶¶ 110-11, 117-19; see also P-H 56.1 Counter. ¶ 115.)

B.   Regarding the Brunswick Commitment and Hospitalization[10]

On July 25, 2015, Brunswick accepted the transfer of Plaintiff from Stony Brook's CPEP, which transfer was made pursuant to Mustafa's MHL § 9.37 certification.  (P-H 56.1 Counter. ¶¶ 122-23.)  "When Plaintiff presented to [Brunswick], she felt defeated and her anxiety level was high."  (Id. ¶ 124.)  As a transferee, Plaintiff's documentation from Stony Brook was subject to review.  (Id. ¶ 128.)  Further, a registered nurse "interviewed and assessed Plaintiff before she underwent a psychiatric consultation performed by a psychiatrist."  (Id. ¶ 131.)

Thereafter, Onuogu conducted a psychiatric consultation of Plaintiff which consisted of a face-to-face evaluation and his review of the documents sent by Stony Brook's CPEP, with the face-to-face evaluation occurring before his review of the Stony Brook

---

[10]   For this subsection, unless otherwise noted, the facts are derived from Plaintiff's Rule 56.1 Counterstatement (see ECF No. 126), which incorporates the Hospital Defendants' statements of fact (see ECF No. 120-24) and includes Plaintiff's responses thereto.

documents.  (Id. ¶¶ 137, 139.)  The face-to-face evaluation lasted from approximately 11:00 p.m. until 11:50 p.m.  (Id. ¶¶ 140, 155.) During the evaluation, "Onuogu asked Plaintiff a 'barrage of questions' but she was 'in shock,' and the only questions she could recall were: why did she go to Stony Brook; did she feel like hurting herself; and was she depressed."  (Id. ¶ 143.)  Onuogu recorded Plaintiff's responses to his questions, noting, inter alia, Plaintiff: had a depressed mood since her gland surgery two weeks earlier; had not been able to sleep; was feeling helpless; was having suicidal ideation, but without specific plans; had experienced numerous loses of family members; was experiencing menopause; and, was not sexually active.  (Id. ¶ 145.)  His evaluation notes further state Plaintiff: had recently verbalized thoughts of self-harm; posed a current risk to herself; presented with: soft, low volume speech, a depressed mood, a blunted affect, and suicidality, with suicidal ideation (no plan); and, had limited insight and judgment.  (Id. ¶¶ 146, 148, 149.)  After completion of his face-to-face evaluation and review of Plaintiff's Stony Brook CPEP chart, Onuogu assessed Plaintiff as having major depressive disorder, which determination was based upon Plaintiff's: "more than two week history of depression; neurovegetative symptoms; significant weight loss/appetite disturbance; lack of sleep; psychomotoretardation [sic]; feelings of helplessness and hopelessness; sexual disturbance; still

feeling that past losses weighing heavily upon her; suicidal ideation (during their face-to-face evaluation, at [Stony Brook], and to her primary care provider); and downward trend in overall functioning." (Id. ¶¶ 150-51.)  Having completed his face-to-face evaluation of Plaintiff, reviewed Plaintiff's Stony Brook CPEP chart, and weighed Plaintiff's risk and mitigating factors, "Onuogu determined that [Plaintiff] posed a substantial risk of danger to herself because she was suicidal." (Id. ¶ 131.)  Thus, he involuntarily admitted Plaintiff to Brunswick for a 72-hour observation period pursuant to MHL § 9.37.  (Id. ¶ 156; see also id. ¶¶ 158-62.)

The next day, July 26, 2015, Hospital staff documented Plaintiff appearing depressed, anxious, and guarded.  (Id. ¶ 165; see also id. ¶ 182.)  Sial, Plaintiff's treating psychiatrist during her Hospital admission, evaluated Plaintiff on July 26th. (Id. ¶¶ 167-68.)  From this first evaluation, which lasted 25-to-30 minutes, Sial documented, inter alia, Plaintiff:  "had no prior significant psychiatric history, no prior psychiatric admission, no prior suicide attempt"; "had been admitted for worsening depression, anxiety, hopelessness, helplessness, decreased sleep, and vague suicidal ideation", with Plaintiff having directly told Sial about being unable to sleep and feeling helpless, hopeless and depressed; "had multiple medical issues [and] multiple somatic symptoms"; had recent parotid gland surgery for sialadenitis after

antibiotics and a tapering dose of steroids in May and June". (Id. ¶¶ 169-70, 172.)   As a result of this examination, Sial made the following mental status findings regarding Plaintiff:

> mood described as depressed; appearance sad, anxious, and nervous; affect flat, constricted, and emotionless; internally perplexed/preoccupied (preoccupied with own thoughts/issues but not able to verbalize same), disassociated, and disconnected; denied suicidal ideation, but then stated that she still had vague suicidal ideation but no plan at that time; irritable (easily annoyed by questions).

(Id. ¶ 171.)   Thereafter, Sial diagnosed Plaintiff with "major depressive disorder, severe" and assigned her a Global Assessment of Functioning ("GAF") score of 30.[11]

Sial testified: her July 26th determination was based upon Plaintiff's presentment and statements made to Sial during Sial's evaluation (id. ¶¶ 174-77); Plaintiff's Stony Brook CPEP records corroborated her assessment (id. ¶ 177); "Plaintiff's symptoms caused her significant distress or impairment in social functioning (internally preoccupied, in her own world, disassociated, not interacting much, answers were very vague and

---

[11]  "A GAF score is a 0-100 scale mental health clinicians use to evaluate how well a person can function in society.  A GAF score of 91-100 is normal, while lower scores indicate psychosocial problems that make life difficult for the person under evaluation." John P. Cunha, DO, FACOEP, What is a Normal GAF Score?, eMental Health, https://www.emedicinehealth.com/what_is_a_normal_gaf_score/article_em.htm (last visited Mar. 25, 2024).

not forthcoming, seemed like she did not want to talk, she did not interact with her family or engage in her usual activities), occupational functioning (suspected she was working without interest), and other important areas of functioning (daily life-not interacting with family, not watching television or movies, not playing games)" (id. ¶ 178); after weighing Plaintiff's risk and mitigating factors, determining "Plaintiff posed a substantial risk of danger to herself because she was suicidal and she was unable to meet her needs of food clothing, and shelter" (id. ¶ 179); because of her concerns for Plaintiff, i.e., that she "would kill herself or suffer a mental breakdown", treating Plaintiff "aggressively with three medications" (id. ¶ 181).

Sial re-evaluated Plaintiff on July 27, 2015, which included an approximate 10-to-15 minute face-to-face interaction with Plaintiff.  (Id. ¶¶ 183, 185)  She continued to find Plaintiff's affect to be "anxious, sad, disassociated, and perplexed".  (Id. ¶ 184.)  Additionally, Sial found Plaintiff was "masking and minimizing her symptoms" and was "frustrated, tearful, and pre-occupied", as well as "denied suicidal thoughts". (Id.)  Thus, based upon Plaintiff's presentment on July 27th, in her clinical judgment, Sial determined: (1) Plaintiff had major depressive disorder, and (2) having considered all relevant mitigating factors, Plaintiff was, nonetheless, a danger to herself as she was suicidal.  (Id. ¶¶ 186-90.)

Thereafter, with the benefit of her July 26th and 27th evaluations, as well as input from Hospital staff, Onuogu's admissions notes, and the Stony Brook CPEP records, Sial completed an Examination Within 72 Hours form (hereafter, the "72-Hour Form") regarding Plaintiff and certified Plaintiff for continued involuntary care at Brunswick pursuant to MHL § 9.37.  (Id. ¶¶ 192-93, 195.)  In Plaintiff's 72-Hour Form, Sial included:

> Plaintiff's pertinent/significant history was depression, hopelessness, and helplessness; her mental condition was depressed, guarded, tearful, and vague suicidal thoughts; her psychiatric signs and symptoms were preoccupied, sad, and anxious; Plaintiff showed a tendency to hurt herself because she was suicidal; and her diagnosis was major depressive disorder.

(Id. ¶ 194.)  In said Form, Sial certified, inter alia, her personal examination of Plaintiff was made "with care and diligence" and that, as a result of said examination, Sial determined "Plaintiff posed a substantial threat of harm to [her]self."  (Id. ¶ 196.)

On July 28, 2015, Sial re-evaluated Plaintiff in-person, at which time the Doctor found Plaintiff continued to be anxious, sad, tearful, and disassociated and during which Plaintiff admitted feeling sad, helpless, and hopeless, and experiencing decreased sleep.  (Id. ¶¶ 199-200.)  Sial also scheduled a July 29, 2015 family meeting with Plaintiff's family members, which she did only in high risk cases.  (Id. ¶¶ 200, 203.)

On July 29, 2015, before the meeting with Plaintiff's family, Sial: again evaluated Plaintiff, at which time she found Plaintiff to be "sad, constricted, and perplexed", as well as having a disassociated affect (id. ¶¶ 205-06); and, found "Plaintiff still posed a risk of suicide, but that it was less than when [Plaintiff] first presented to [Brunswick]" (id. ¶ 207). At the family meeting, which was held to enable Sial to assess the support level of Plaintiff's family and to educate the family about Plaintiff's depression, a July 30, 2015 discharge plan was established, with Plaintiff's family agreeing to same. (Id. ¶¶ 208-10, 212.)

On July 30, 2015, before Plaintiff's discharge, a Brunswick social worker documented Plaintiff was less depressed and was sleeping better. (Id. ¶214.) Also before her July 30th discharge, Sial conducted an in-person re-evaluation of Plaintiff; Sial documented that while Plaintiff was calm and had an improved mood, she "still had a sad affect; her affect was constricted; she was disassociated", but "she denied suicidal thoughts or plan". (Id. ¶¶ 215-16.) Sial's July 30th discharge diagnosis of Plaintiff was severe major depressive disorder; however, having weighed Plaintiff's risk and mitigating factors on that day, Sial determined Plaintiff did not pose a substantial threat of harm to herself. (Id. ¶¶ 217-18.) Further, at the time of her discharge, Sial determined Plaintiff's GAF score had increased to 60. (Id.

¶ 219.)  In conformity with the July 29th discharge plan, On July 30, 2015, Plaintiff was discharged from Brunswick.  (Id. ¶ 220.)

In accordance with her discharge plan, thereafter, Plaintiff engaged in psychiatric treatment.  (Id. ¶ 221; see also id. at ¶¶ 222-25.)  Her treating psychiatrist diagnosed Plaintiff with major depressive disorder and generalized anxiety disorder. (Id. ¶ 226.)

## II.  Relevant Procedural Background

Plaintiff commenced this action on July 22, 2016.  (See Compl., ECF No. 1.)  After: (1) three amendments to Plaintiff's Complaint (see, e.g., First Am. Compl., ECF No. 15; Second Am. Compl., ECF No. 34; TAC); (2) multiple extensions to the discovery deadlines (see Case Docket, passim); (3) two settlements, i.e., (a) a settlement with defendant Franoeur ("Franoeur") and third-party defendant Bells Nurses Registry & Employment Agency, Inc., ("Bells Nurses") resulting in their purported dismissal from this action (see, e.g., ECF No. 80, and AYS Feb. 25, 2019 Elec. Order), and (b) a further settlement whereby Plaintiff agreed to withdraw certain causes of action, to wit, Plaintiff's (i) Second and Third Causes of Action against Francoeur and the Hospital, (ii) Fourteenth Cause of Action against Francoeur and the Hospital, and (iii) Fifteenth Cause of Action against the Hospital; (4) Plaintiff's voluntary withdrawal of her Eighth Cause of Action as against the Hospital (see PMC Response, ECF No. 105, at 3); (5)

several reassignments of judges and magistrate judges presiding over this action; and (6) prior presiding Judge Gary R. Brown's having granted Plaintiff's reconsideration motion which ostensibly vacated his prior partial granting of summary judgement in favor of Mustafa (see Reconsideration Order, ECF No. 113; Minute Entry, ECF No. 108 (at pre-motion conference, deeming summary judgment motion made and granting in part said motion as to Mustafa)), the respective Summary Judgment Motions of Mustafa and the Hospital Defendants are ripe for consideration.[12]

---

[12] For clarity, the Court deems:

(a) Francoeur and Bells Nurses to be dismissed from this action in light of (i) said defendants' February 25, 2019 letter motion (ECF No. 80), which Magistrate Judge Shields granted, (ii) the filed Stipulation of Settlement (ECF No. 87) regarding claims against Francoeur having been withdrawn by Plaintiff (ECF No. 87); and (iii) Plaintiff's subsequent course of conduct in this action, i.e., no longer pursuing her action against Francoeur and Bells Nurses;

(b) the Stipulation of Settlement (ECF No. 87) "SO ORDERED"; therefore, Plaintiff's Second, Third, Fourteenth, and Fifteenth causes of actions are withdrawn and discontinued with prejudice; and

(c) the summary judgment in favor of Mustafa, granted on March 25, 2020 (see Minute Entry, ECF No. 108), to have been vacated by Judge Brown on June 15, 2020 (see Reconsideration Order, ECF No. 113), thereby resulting in all causes of action against Mustafa to be currently pending (see June 19, 2020 Letter, ECF No. 115 (remaining parties' proposed briefing schedule); JS June 22, 2020 Elec. Sch. Order (adopting proposed briefing schedule)).

DISCUSSION

I.   Applicable Law

     A.   The Rule 56 Standard Generally

          The standard for deciding a Rule 56 summary judgment

motion is well-established.  For convenience, the Court reiterates

said standard:

> Pursuant to Rule 56(a), "[a] court shall
> grant summary judgment if the movant shows
> that there is no genuine dispute as to any
> material fact and the movant is entitled to
> judgment as a matter of law." FED. R. CIV. P.
> 56(a).  "A fact is 'material' for these
> purposes when it might affect the outcome of
> the suit under the governing law." Adamson v.
> Miller, 808 F. App'x 14, 16 (2d Cir. 2020).
> Additionally, "'[a]n issue of fact is
> 'genuine' if the evidence is such that a
> reasonable jury could return a verdict for the
> nonmoving party.'" Id. (quoting Jeffreys v.
> City of N.Y., 426 F.3d 549, 553 (2d Cir.
> 2005)).  "If, as to the issue on which summary
> judgment is sought, there is any evidence in
> the record from which a reasonable inference
> could be drawn in favor of the opposing party,
> summary judgment is improper." Hetchkop v.
> Woodlawn at Grassmere, Inc., 116 F.3d 28, 33
> (2d Cir. 1997).  Moreover, "the court is not
> to make assessments of the credibility of
> witnesses" on a motion for summary judgment,
> as "[c]redibility assessments, choices
> between conflicting versions of events, and
> weighing of the evidence are matters for the
> jury." Id.
> On a motion for summary judgment the
> court considers "the pleadings, depositions,
> answers to interrogatories and admissions on
> file, together with any other firsthand
> information including but not limited to
> affidavits." Nnebe v. Daus, 644 F.3d 147, 156
> (2d Cir. 2011).  Further, while the court "may
> consider other materials in the record," it

Page 19 of 74

"need consider only the cited materials" in ruling on a summary judgment motion. FED. R. CIV. P. 56(c)(3); see also Pennington v. D'Ippolito, 855 F. App'x 779, 782 (2d Cir. 2021) ("[I]n ruling on a summary judgment motion the court need consider only the cited materials in the parties' submissions." (internal citations and alterations omitted)).

In reviewing the record, "the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Sheet Metal Workers' Nat'l Pension Fund v. Vardaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)). When drawing inferences from evidence in the record in favor of the non-moving party, however, a court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (quoting County of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1318 (2d Cir. 1990)).

"Once the movant has 'demonstrat[ed] the absence of a genuine issue of material fact . . . the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim.'" Pennington, 855 F. App'x at 781 (alteration in original) (quoting Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)). To do this, "[t]he non-moving party is required to 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" Id.

Lavender v. Verizon N.Y. Inc., No 17-CV-6687, 2023 WL 1863245, at *8 (E.D.N.Y. Feb. 9, 2023); see also Butler v. County of Suffolk, No. 11-CV-2602, 2023 WL 5096218, at *18-20 (E.D.N.Y. Aug. 8, 2023) (similarly articulating summary judgment standard; additionally

discussing consideration of: Local Rule 56.1 statements; admissibility of expert reports; and affidavits).

B. <u>Consideration of Affidavits in Support of Summary Judgment</u>

"It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." <u>Colvin v. Keen</u>, No. 13-cv-3595, 2016 WL 5408117, at *3 (E.D.N.Y. Sept. 28, 2016). Indeed,

> a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony. <u>Perma Research & Dev. Co. v. Singer Co.</u>, 410 F.2d 572, 578 (2d Cir. 1969) (examining omission in four-day deposition); <u>Martin v. City of New York</u>, 627 F. Supp. 892, 896 (E.D.N.Y. 1985) (examining direct contradiction between deposition and affidavit). "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." <u>Perma</u>, 410 F.2d at 578. Thus, factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not "genuine" issues for trial. <u>Id.</u>

<u>Hayes v. N.Y.C. Dep't of Corrs.</u>, 84 F.3d 614, 619 (2d Cir. 1996); <u>see also</u> <u>In re Fosamax Prods. Liab. Litig.</u>, 707 F.3d 189, 193 (2d Cir. 2013) (holding that a party is prohibited "from defeating summary judgment simply by submitting an affidavit that contradicts the

party's previous sworn testimony"); Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806 (1999) ("[A] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement . . . without explaining the contradiction or attempting to resolve the disparity."); Buttry v. Gen. Signal Corp., 68 F.3d 1488, 1493 (2d Cir. 1995) ("[I]t is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment." (quotations and citation omitted)); Pierre v. Hilton Rose Hall Resort & Spa, No. 14-cv-3790, 2016 WL 4742281, at *10 (E.D.N.Y. Sept. 12, 2016) (finding plaintiff unable to produce competent evidence to defeat defendant's summary judgment motion where plaintiff's affidavit contradicted his deposition testimony); Ciliberti v. Int'l Bhd. of Elec. Workers Local 3, No. 08-cv-4262, 2012 WL 2861003, at *11 (E.D.N.Y. July 10, 2012) (rejecting plaintiff's attempt to create disputed issues of fact via affidavit, when his prior deposition testimony foreclosed any such disputes); Jeffrey v. Montefiore Med. Ctr., No. 11-cv-6400, 2013 WL 5434635, at *15 (S.D.N.Y. Sept. 27, 2013) (finding, where inconsistencies existed between a non-movant's affidavit and corresponding deposition testimony, which inconsistencies the non-movant party made no effort to reconcile or otherwise explain, the court did not consider those statements) (collecting cases).

Haxton v. PL Smithtown, LLC, No. 17-CV-3979, 2020 WL 1244849, at *7 (E.D.N.Y. Mar. 16, 2020).  "Where inconsistencies exist between a non-movant's affidavit and corresponding deposition testimony, which inconsistencies the non-movant party makes no effort to reconcile or otherwise explain, a court may disregard those statements."  Patacca v. CSC Holdings, LLC, No. 16-CV-0679, 2019 WL 1676001, *6 (E.D.N.Y. Apr. 17, 2019) (citing Jeffrey, 2013 WL 5434637, at *15 (collecting cases)).

     C.   MHL § 9.37

     "Cognizant of the gravity of such an event, New York law establishes detailed procedures for hospitalizing an individual against his or her will.  One such procedure [is] codified in New York Mental Hygiene Law ("MHL") § 9.37," which, under certain circumstances, permits the hospitalization of persons with a mental illness. Jackson v. Barden, No. 12-CV-1069, 2018 WL 340014, at *1 (S.D.N.Y. Jan. 8, 2018).  In relevant part, § 9.37 provides:

> The director of a hospital, upon application by a director of community services or an examining physician duly designated by him or her, may receive and care for in such hospital as a patient any person who, in the opinion of the director of community services or the director's designee, has a mental illness for which immediate inpatient care and treatment in a hospital is appropriate and which is likely to result in serious harm to himself or herself or others.
>
> The need for immediate hospitalization shall be confirmed by a staff physician of the hospital prior to admission.  Within

seventy-two hours, excluding Sunday and holidays, after such admission, if such patient is to be retained for care and treatment beyond such time and he or she does not agree to remain in such hospital as a voluntary patient, the certificate of another examining physician who is a member of the psychiatric staff of the hospital that the patient is in need of involuntary care and treatment shall be filed with the hospital. From the time of his or her admission under this section the retention of such patient for care and treatment shall be subject to the provisions for notice, hearing, review, and judicial approval of continued retention or transfer and continued retention provided by this article for the admission and retention of involuntary patients, provided that, for the purposes of such provisions, the date of admission of the patient shall be deemed to be the date when the patient was first received in the hospital under this section.

MHL § 9.37(a).

II.   Application

A.   Preliminary Ruling

As an initial matter, Plaintiff asks the Court to rely upon her post-deposition affidavit ("Pl.'s Aff.") (see ECF No. 129), in finding there are material disputed facts regarding her detention-for-transport and confinement which thwarts the granting of summary judgment. (See Opp'n at 15-16.) To support this position, Plaintiff relies upon Rodriguez v. City of New York for the proposition that where, by way of affidavit, a plaintiff challenges the accuracy or completeness of doctors' notes made in hospital records, such "denials creat[e] issues of fact as to what

the plaintiff-patient told the doctor."   (Id. at 16 (quoting Rodriguez v. City of N.Y., 72 F.3d 1051, 1055 (2d Cir. 1995); and citing id. at 1064-65).)   Plaintiff then proceeds to articulate various information she contends is false, inaccurate, or lacks credibility.   (See id. at 16-18.)   Plaintiff also advances the argument that she is a more credible witness than the medical personnel who interviewed her in late July 2015 at Stony Brook and at Brunswick; she relies upon affidavits from her husband, best friend, and boss to support this contention.   (See id. at 18-20.)

The Court rejects Plaintiff's reliance upon her Affidavit (see ECF No. 129) to establish disputed facts, which the Court finds to be inconsistent with her prior deposition testimony and which inconsistencies Plaintiff fails to adequately reconcile or otherwise explain.   See Patacca, 2019 WL 1676001, *6.   Indeed, it is well-established in this Circuit that a court need not rely upon such a "sham affidavit".   See Moll v. Telesector Res. Grp., Inc., 760 F.3d 198, 205 (2d Cir. 2014) ("The 'sham issue of fact' doctrine prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." (emphasis omitted)); Prophete-Camille v. Stericycle, Inc., No. 14-CV-7268, 2017 WL 570769, at *5 (E.D.N.Y. Feb. 13, 2017) ("The Second Circuit has held that a party cannot manufacture issues of fact by submitting an affidavit that contradicts her prior deposition testimony." (citation and

internal quotation marks omitted)).  Plaintiff's time to explain what she meant by her responses to various Stony Brook and Hospital personnel evaluators, including Mustafa and the Hospital Doctors, was during her deposition when those issues were being explored. See Patacca, 2019 WL 1676001, *14 ("A 'plaintiff may not create material issues of fact by submitting affidavits that dispute their own prior testimony' regarding issues which have been thoroughly or clearly explored." (quoting In re World Trade Ctr. Lower Manhattan Disaster Site Litig., 758 F.3d 202, 213 (2d Cir. 2014); further citation omitted)).  Her attempts to provide such explanations via her post-deposition affidavit is unavailing to create disputed issues of fact which would defeat summary judgment. See Vuona v. Merrill Lynch & Co., Inc., 919 F. Supp. 2d 359, 391 (S.D.N.Y. 2013) (finding that, where deponent had opportunity to address relevant issue during deposition, later declaration testimony directly contradicting deposition testimony would not be considered in opposing summary judgment).  Further, many of Plaintiff's statements in her Affidavit are little more than speculation.[13]  Moreover, other of Plaintiff's statements do not

---

[13] (See, e.g., Pl. Aff. ¶¶ 21 ("Because of the pain and discomfort following surgery, I may not have wanted to go out socially immediately following the surgery [or] may not have wanted to answer the phone . . . ."), 25 ("I believe this statement most likely came from the emergency department doctor asking whether I had thoughts of hurting myself or killing myself."), 29 ("Perhaps [Nurse] Fining interpreted my statements as indicating that the quality of my life had recently gone down."), 31 ("I may have said,

address material facts going towards her causes of action. Therefore, Plaintiff's post-deposition Affidavit will not be considered by the Court. In turn, to the extent Plaintiff relies upon her Affidavit to dispute the Defendants' respective Local Rule 56.1 statements of fact, such reliance is unavailing, with the Court deeming such facts to be undisputed.

B. <u>Mustafa's Summary Judgment Motion</u>

Plaintiff brings two federal causes of action against Mustafa: (1) the First Cause of Action, brought pursuant to Section 1983, alleging violations of the Fourth and Fourteenth Amendments premised upon the alleged violation of MHL § 9.37; and (2) the Fifth Cause of Action, alleging a Section 1983 violation based upon Mustafa's purported departure from accepted professional standards when Mustafa determined Plaintiff should be

---

'I do not like being a burden to my family.' By this I meant that I did not like that my husband often had to take me to doctor appointments. It was a little unfair to him."), 38 ("If I said I was not sleeping for two weeks, it was a statement not to be taken literally. Rather, I meant, I had difficulty sleeping the last two weeks."), 44 ("It is doubtful I would have said I was depressed, although I found my medical condition depressing."), 52 ("When Dr. Kadiyala went to take what he wrote down on pad and place it in the computer-generated form, he may have jumbled all of this information together, including confusing my situation with that of the patient named Lisa."), 59 ("[W]hile I do not remember every bit of conversation with Dr. Mustafa, I would have never said I felt hopeless, worthless or helpless."), 75 (in disavowing information contained in Onuogu's notes, stating "Dr. Onuogu had to receive this information from the papers he was looking at and copying from when I entered the room"), 91 ("I believe Dr. Rosen slightly misinterpreted what I said.").)

detained-for-transport.   Plaintiff further brings several state law claims against Mustafa: (3) two claims alleging false imprisonment, i.e., the Ninth and Tenth Causes of Action; and (4) two medical malpractice claims, i.e., the Twelfth and Thirteenth Causes of Action.

Mustafa moves for summary judgment requesting judgment in her favor as to all claims brought against her.

    1.   The Parties' Positions

    a.   Mustafa's Position

Regarding First Cause of Action: Relying upon a 2019 case from the Eastern District of New York, Aouatif v. City of New York, Mustafa argues that, as the doctor who determined Plaintiff should be transported from Stony Brook to Brunswick and not the doctor who determined Plaintiff should be committed, there is no basis to bring a Fourteenth Amendment claim against her. (M-Support Memo at 6-7 (citing Aouatif v. City of N.Y., No 07-CV-1302, 2019 WL 2410450 (E.D.N.Y. May 31, 2019)).)  Mustafa also draws the Court's attention to Green v. City of New York, a Second Circuit case holding that when the conduct at issue is the patient's transportation to a hospital to undergo treatment--and, not commitment to the hospital--, no Fourteenth Amendment due process violation is had.  (See id. at 6 (citing Green v. City of N.Y., 465 F.3d 65, 95 (2d Cir. 2006)).)

Alternatively, Mustafa seeks qualified immunity. (See M-Support Memo at 8-16.) She generally argues qualified immunity is warranted because, given the circumstances presented when Mustafa examined Plaintiff, it was objectively reasonable for her to believe Plaintiff posed a threat to herself, thereby authorizing her transfer to Brunswick. (See id. at 8-10.) Mustafa's expert confirms that Mustafa's actions were, at the very least, objectively reasonable (see id. at 12-13), and Plaintiff's expert concedes a doctor acting in the manner Mustafa did when making her determination regarding Plaintiff would be considered acting in an objectively reasonable manner. (See id. at 13-14.) Finally, Mustafa would have the Court reject Plaintiff's argument that Mustafa did not act reasonably based upon Plaintiff's deposition testimony denying making many suicidal ideation statements attributed to her by the Stony Brook staff since, under case law, such "bare denials of statements allegedly made by patients under such circumstances [are not] enough to defeat summary judgment." (Id. at 15-16 (quoting Aouatif, 2019 WL 2410450, at *8 (further citation omitted; internal quotation marks omitted)).) Indeed, Mustafa contends, "[g]iven the notations in the Stony Brook chart, [she] would have acted unreasonably if she had not authorized the [P]laintiff be transported to Brunswick Hospital." (Id. at 16 (emphasis in original); see also M-Reply at 7 (quoting Torcivia v. Suffolk County, 409 F. Supp. 3d 19, 48 (E.D.N.Y. 2019)).)

Regarding Fifth Cause of Action:  Mustafa asks the Court to dismiss this cause of action because Plaintiff bases her claimed Section 1983 violation on Mustafa's alleged departure from accepted medical practices, which is neither a federal statutory nor constitutional right.  (See M-Support Memo at 7-8.)  Thus, there is no federal right to be vindicated pursuant to Section 1983.  (See id. at 7 (citing Jackson, 2018 WL 340014, at *13).) Moreover, to the extent Plaintiff bases this cause of action on the time she remained at Stony Brook before being transported to Brunswick, Mustafa contends this cause of action is duplicative of Plaintiff's First Cause of Action, thereby warranting its dismissal.  (See M-Reply at 8.)

Regarding Ninth and Tenth Causes of Action:  Mustafa contends Plaintiff cannot succeed on her state law false imprisonment claims because even if Plaintiff is able to establish confinement that Mustafa intended and to which Plaintiff was conscious but did not consent, Mustafa can show her actions were "otherwise privileged" since she complied with the applicable MHL and did not commit malpractice.  (See M-Support Memo at 16-17 (omitting citations).)  Moreover, because Mustafa's actions were objectively reasonable, she should be immune under both federal and state law.  (See id. at 18 (citing Mesa v. City of N.Y., No. 09-CV-10464, 2013 WL 31002, at * 12 (S.D.N.Y. Jan. 3, 2013) (stating "where an officer's actions are deemed objectively

reasonable, that officer will be immune under both federal and state law"); further citation omitted); see also id. at 19 (discussing further cases where courts found defendants immune from false imprisonment state claims based upon similar immunity to false imprisonment federal claims); M-Reply at 9.)   Thus, Mustafa is able to defend against Plaintiff's false imprisonment claims warranting summary judgment in her favor.

Regarding Twelfth and Thirteenth Causes of Action: Mustafa asserts Plaintiff's medical malpractice claims should be dismissed if the Court finds she is entitled to qualified immunity as to Plaintiff's Section 1983 claims.   That is so because the "objectively reasonable" prong of qualified immunity is the equivalent of a reasonable medical judgment.   Mustafa argues "[a] determination made pursuant to Article 9 of the Mental Hygiene Law . . . constitutes a medical judgment," and her "decision to authorize the [P]laintiff to be transported to Brunswick Hospital was based on her medical judgment."   (M-Support Memo at 21.) Moreover, "Plaintiff's expert[14] concedes that a doctor could reasonably conclude that [P]laintiff had recurrent thoughts of death and recurrent thoughts of suicidal ideation."   (Id. at 22 (citing Stastny Dep. Tr., Ex. Q., at 100-01).)   In light of these and other concessions, therefore, it is undisputed Mustafa

---

[14]  Plaintiff's medical expert is Peter Stastny, M.D. ("Stastny"), a board certified psychiatry.   (See Stastny Decl., ECF No. 128.)

exercised appropriate medical judgment.  Further, without more, it is not enough to establish psychiatric malpractice simply because another doctor might have pursued a different course of treatment. (See id. at 23 (citation omitted); see also id. (similarly asserting purported erroneous judgment is not the same as plain incompetence).)  Additionally, because New York common law recognizes the doctrine of government immunity, since Mustafa's duties involved "the exercise of . . . . discretion and judgment" in deciding to have Plaintiff transported to the Hospital, Mustafa should be relieved from liability for any injurious consequences of her determination regarding Plaintiff.  (See id. at 24 (first quoting Mon v. City of N.Y., 78 N.Y.2d 309, 313 (1991); then quoting Sean M. v. City of N.Y., 20 A.D.3d 146, 158 (1st Dep't 2005) (further citation omitted)); see also M-Reply at 10.)  Hence, in this instance, because her medical judgment was reasonable and because her acts were discretionary, involving the exercise of her expert judgment, Mustafa should be found immune from Plaintiff's medical malpractice causes of action.

     b.   Plaintiff's Counter-Position

     Regarding First Cause of Action: The crux of Plaintiff's opposition regarding her First Cause of Action is that it "is premised on her detainment for transport and not confinement." (Opp'n at 23 (citing Radomisli Decl., Ex P-H, ¶ 72).)  She relies upon Glass v. Mayas in furtherance of her claim that one "who has

been detained for transport to, and further evaluation at, a psychiatric [hospital for] evaluation without probable cause" suffers a violation of her Fourth Amendment rights.  (Id. (citing Glass v. Mayas, 984 F.2d 55, 57 (2d Cir. 1993).)

Regarding Fifth Cause of Action:  Plaintiff generally argues that if she is able to establish the doctors--including Mustafa--engaged in medical malpractice, then defendant doctors cannot claim her confinement was "otherwise privileged".  (See Opp'n at 26.)  Under such a scenario, Plaintiff's confinement not only subjects the defendant doctors to false imprisonment liability under state law, but also subjects them to Section 1983 liability.  (See Opp'n at 26.)  Then, relying upon her medical expert, Stastny, Plaintiff asserts "[q]uestions of fact exist as to whether the defendants acted with an insufficient basis and engaged in medical malpractice when they certified [Plaintiff] for involuntary detainment, transport and confinement," as well as to whether Plaintiff suffered from a mental illness and posed a substantial threat of harm to herself.  (Id. at 27 (citing Stastny Decl., ¶¶ 19-34, 35-48, 49-63).)  Plaintiff does not develop these cursory arguments.

In a similarly skeletal manner, Plaintiff asserts the arguable probable cause standard which governs false arrest and imprisonment claims pursuant to Section 1983 equally applies to Mustafa's claim of qualified immunity to Plaintiff's Fifth Cause

of Action, i.e., her Fourth Amendment-based cause of action.  (See Opp'n at 32.)

Regarding Plaintiff's State Law Claims:  First, as to Mustafa's claims of immunity, Plaintiff maintains "the government immunity doctrine 'has no application in cases where the State engages in a proprietary function . . . such as providing medical and psychiatric care.'"  (Opp'n at 35 (quoting Applewhite by Applewhite v. Accuhealth, Inc., 21 N.Y.3d 420, 433 (2013) (further citation omitted); internal quotation marks omitted).)  Therefore, Mustafa's claim of immunity based upon her exercise of discretion and judgment is without merit.  (Id.)  Second, as to Plaintiff's request this Court maintain her state law false imprisonment and medical malpractice claims, Plaintiff does not mention Mustafa. (See Opp'n at 35-36.)  Finally, Plaintiff simply contends the Court should retain supplemental jurisdiction over her state law claims because "[t]he defendants[15] have been supported by deep-pocketed malpractice insurance carriers."  (See id. at 36.)

c.  Mustafa's Reply

Mustafa takes issue with Plaintiff's trying to create disputed issues of fact by relying upon her affidavit and the affidavits of others, i.e., Husband, friend, and boss, as a means

---

[15]  It is unclear whether this argument also encompasses Mustafa.

of contesting the accuracy of the Stony Brooks records.  (See Reply
at 2.)  Mustafa contends:

> [P]laintiff's counsel devised a simple
> strategy to oppose [D]efendants' motions for
> summary judgment based upon qualified
> immunity: submit an Affidavit from the
> [P]laintiff refuting almost all the statements
> attributed to her by healthcare professionals
> in the medical records that were
> contemporaneously written while the
> [P]laintiff was in the hospital.

(Id.)  She contends Plaintiff's counsel used this same tactic to
defeat summary judgment decades earlier in Rodriguez v. City of
New York, but that this case is distinguishable from Rodriguez
since, here, four doctors, a nurse, and a social worker all made
entries to Plaintiff's chart, as compared to two medical personnel
doing the same in Rodriguez.  (See id.)  Therefore, this Court
should reject Plaintiff's reliance upon a simple "deny, deny, deny"
strategy to create disputed issues of fact, which, if adopted
"would essentially vitiate the doctrine of qualified immunity at
the summary judgment stage."  (Id.)

Mustafa also highlights Plaintiff's counsel retaining
the same medical expert here, i.e., Stastny, as in Rodriguez to
challenge whether the defendant doctors' actions were objectively
reasonable or were a departure from generally accepted medical
standards.  (See id. at 2, 5-6.)  Mustafa argues Stastny's
assessment should not be afforded weight since "his explanation as
to why the [P]laintiff did not meet the criteria [for a mental

illness] is based upon information that was not available to Dr. Mustafa." (Id. 5-6.)

2. The Court's Analysis

Regarding First Cause of Action:   While Plaintiff's First Cause of Action was based upon her alleged unreasonable seizure, which she contends violated her Fourth and Fourteenth Amendment rights (see TAC ¶ 72), in her Opposition, Plaintiff explains it was her detention-for-transport to Brunswick that is the impetus for this Cause of Action. (See Opp'n at 23.)   In so stating, Plaintiff implicitly concedes her First Cause of Action states only a violation of the Fourth Amendment. (See id. (asserting one who has been detained for transport to another facility for a psychiatric evaluation without probable cause suffers a Fourth Amendment violation and stating "[r]eference to the Fourteenth Amendment was technically required because the Fourth Amendment becomes applicable to the states through the Fourteenth Amendment").)   What remains, therefore, is Plaintiff's Section 1983 claim of a Fourth Amendment violation premised upon Mustafa's decision to have Plaintiff transported to Brunswick. See, e.g., Eze v. City Univ. of N.Y. at Brooklyn Coll., No. 11-CV-2454, 2011 WL 6780652, at *3 (E.D.N.Y. Dec. 27, 2011) ("The act of transporting someone to a hospital against her will to be committed, as distinct from the commitment itself, is properly

analyzed only as a Fourth Amendment violation." (citations omitted)).

It is well-established:

Section 1983 provides for an action at law against a "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects or causes to be subjected, any citizen of the Unite[d] States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and law." 42 U.S.C. § 1983; see also, e.g., Herring v. Suffolk County Police Dep't, No. 17-cv-5904, 2018 WL 7150387, at *4 (E.D.N.Y. Oct. 19, 2018) ("[T]o prevail on any claim brought pursuant to Section 1983, a plaintiff must demonstrate that he has been denied a constitutional right or federal statutory right and that the deprivation occurred under color of state law.") (further citation and internal quotations omitted) (report and recommendation), adopted by 2019 WL 402859 (E.D.N.Y. Jan. 31, 2019). It "is not itself a source of substantive rights"; rather, it "merely provides a method for vindicating federal rights elsewhere conferred . . . ." Patterson v. County of Oneida, 375 F.3d 206, 225 (2d Cir. 2004)(quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); see also Lockwood v. Town of Hempstead, No. 16-cv-3756, 2017 WL 3769253, at *2 (E.D.N.Y. Aug. 28, 2017) (stating § 1983 provides only a procedure for redress for the deprivation of rights established elsewhere) (adopting report & recommendation). "Therefore, to prevail on a claim arising under Section 1983, a plaintiff must establish: '(1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law.'" Lockwood, 2017 WL 3769253, at *2 (quoting Hawkins v. Nassau County Corr. Facility, 781 F. Supp.2d 107, 111 (E.D.N.Y. 2011)).

Estate of Keenan v. Hoffman-Rosenfeld, No. 16-CV-0149, 2019 WL
3410006, at *13 (E.D.N.Y. July 29, 2019), aff'd 833 F. App'x 489
(2d Cir. Nov. 5, 2020).

      To begin, there is no dispute Mustafa, who is a doctor-
employee of Stony Brook, which, as part of the SUNY system is a
public institution and, therefore, a state actor, is also deemed
a state actor.  See generally, NCAA v. Tarkanian, 488 U.S. 179,
183, 192 (1988) ("A state university without question is a state
actor" and its executives "unquestionably act under color of state
law" when "performing their official functions."); see also, e.g.,
Jones v. Nickens, 961 F. Supp. 2d 475, 485-86 (E.D.N.Y. 2013)
(finding no dispute that Stony Brook is a public institution);
Capellupo v. Nassau Health Care Corp., No. 06-CV-4922, 2009 WL
1705749, at *6 (E.D.N.Y. June 16, 2009) (finding doctor employees
of a public benefit corporation were state actors for purposes of
a Section 1983 claim).  The issue, then, is whether Plaintiff has
established a deprivation of her constitutional right to be free
of an unreasonable seizure guaranteed by the Fourth Amendment.
See, e.g., Aouatif, 2019 WL 2410450, at *9 ("Involuntary transport
to a hospital may also constitute a seizure for purposes of the
Fourth Amendment.").

      The Second Circuit has "held that in order to
constitutionally seize a person to transport him to a hospital,
the person must be dangerous, presumably to himself or others."

Green, 465 F.3d at 83 (citing Glass v. Mayas, 984 F.2d 55, 58 (2d Cir. 1993)).  The crux of Plaintiff's position is her detention-for-transport to Brunswick was unconstitutional since Mustafa's examination was insufficient to conclude Plaintiff was a danger to herself, i.e., Mustafa's determination regarding Plaintiff's danger to herself fell below acceptable levels of medical competence, making it unreasonable.

> A seizure for transportation
>
> does not violate the Fourth Amendment . . . if there is probable cause for it, meaning that there existed "'reasonable grounds for believing that the person seized' is dangerous to herself or to others." Anthony v. City of New York ("Anthony II"), 339 F.3d 129, 137 (quoting Glass, 984 F.2d at 58). "For a mental health seizure," the law requires only "a probability or substantial chance of dangerous behavior, not an actual showing of such behavior." Heller[ v. Bedford Cent. Sch. Dist.], 144 F. Supp. 3d [596,] 622 [(S.D.N.Y. 2015)] (internal quotation marks omitted) (citation omitted).  To determine whether probable cause existed to justify a mental health seizure, courts must look to "the specific observations and information available" at the time of the seizure. Myers [v. Patterson], 819 F.3d [625,] 633 [(2d Cir. 2016)]; see also Mizrahi [v. City of N.Y., No. 15-CV-6084], 2018 WL 3848917, at *20 [(E.D.N.Y. Aug. 13, 2018)].

Aouatif, 2019 WL 2410450, at *9 (emphasis added).  Moreover, the "plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those

standards." Id. at *8 (quoting Kraft v. City of N.Y., 696 F. Supp. 2d 403, 413 (S.D.N.Y. 2010); internal quotation marks and further citation omitted).

Plaintiff has failed to establish a constitutional violation of the Fourth Amendment. There is ample undisputed evidence that at the time she presented to the Stony Brook CPEP, the specific observations and information available established a probability that Plaintiff was a danger to herself. In addition to Plaintiff's evaluation by Stony Brook ED personnel, which evaluation notes Mustafa reviewed, by the time Mustafa first met Plaintiff, Plaintiff had been evaluated by several Stony Brook CPEP personnel, i.e., a psychiatric nurse, a social work intern under the supervision of a social worker, and a resident doctor. (See supra BACKGROUND, Part I(A), at 5-8.) From those interactions, there were multiple, consistent notations regarding Plaintiff reporting, inter alia, she was: feeling depressed; suffering episodes of crying; feeling badly about past events; having protracted trouble sleeping and not being able to sleep; not enjoying life as exemplified by not wanting to socialize with friends and isolating herself and by no longer engaging in activities which she had previously enjoyed; and, wanting to jump off a bridge and leave this earth. (See id.) Despite these preliminary observations recorded in Plaintiff's Stony Brook chart, which Mustafa also reviewed, as well as Mustafa's

consultation with the resident, Mustafa further engaged in at least three face-to-face interactions with Plaintiff ranging from upwards of 45 minutes to a 10-minute evaluation. (See id. at 8-9.) Based upon Mustafa's multiple personal evaluations of Plaintiff, in conjunction with her consideration of the information from collateral sources, it was reasonable for Mustafa to conclude Plaintiff exhibited a probability or substantial chance of danger to herself.   Indeed, Mustafa recorded her impression that Plaintiff's ongoing medical issues led to poor sleep, poor appetite, weight loss, hopelessness, worthlessness and recent suicidal ideation, which supported her medical judgment that Plaintiff was a possible danger to herself, thereby warranting her transport to Brunswick for further assessment. (See P-M Counter. ¶¶ 109-11.)   Thus, during the time of Plaintiff's presentation at Stony Brook, when Mustafa was addressing Plaintiff's emergent situation, in light of the substantial contemporary collateral information available to Mustafa, including the multiple, consistent observations of the Stony Brook ED personnel and the Stony Brook CPEP personnel, which Mustafa confirmed by way of at least three face-to-face evaluations of Plaintiff, there was sufficient evidence for Mustafa to conclude Plaintiff posed a danger to herself; in turn, detention-for-transport was justified and there was no violation of Plaintiff's Fourth Amendment rights. See Bryant, 462 F. Supp. 3d at 260 ("For a mental health seizure,

the law requires only 'a probability or substantial chance of dangerous behavior, not an actual showing of such behavior.'" (quoting Heller v. Bedford Cent. Sch. Dist., 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015)); see also Aouatif, 2019 WL 2410450, at *9-10.

Even if that were not so, given the facts of this case, Mustafa would be entitled to qualified immunity. As the Aouatif Court stated:

> The doctrine of qualified immunity protects public officials from liability for violating clearly established constitutional rights, so long as it was objectively reasonable for the official to believe that his conduct did not violate such rights. See Katzman [v. Khan], 67 F. Supp. 2d [103,] 109 [(E.D.N.Y. 1999)]; Brown [v. Catania, No. 3:06-CV-0073,] 2007 WL 879081, at *6 [(D. Conn. Mar. 21, 2007)] (citing Anderson v. Creighton, 483 U.S. 635, 638-39 (1987)). Qualified immunity is a two-step inquiry: first, the Court examines whether the official's conduct violated a clearly established constitutional right; second, even if the official did violate such a right, he "is still entitled to qualified immunity if it was objectively reasonable for him to believe that his conduct did not violate [that right]." Brown, 2007 WL 879081, at *6 (citing Saucier v. Katz, 533 U.S. 194, 201 (2001); Anderson, 483 U.S. at 638-39). "To be deprived of the defense of qualified immunity, a public official must not simply violate plaintiff's rights; rather, the violation of plaintiff's rights must be so clear that no reasonable public official could have believed that his actions did not violate such rights." Stanley v. Cooper, 996 F. Supp. 316, 320-21 (S.D.N.Y. 1998) (citing Anderson, 483 U.S. at 640); see also Birmingham v. Ogden, 70 F. Supp. 2d 353, 375 (S.D.N.Y. 1999) ("[W]here the law is clearly settled, summary judgment may be

granted on qualified immunity grounds if the _only_ conclusion a rational jury could reach is that reasonable officials would disagree about the legality of the defendants['] conduct under the circumstances." (internal brackets omitted) (internal quotation marks omitted) (citation omitted)).

In the context of involuntary transport to the hospital, the availability of qualified immunity turns on whether, _at the time [the doctor authorized the transport] and in light of the information he then possessed_, it was objectively reasonable for him to believe that [the plaintiff] posed a risk of serious harm to herself or others. _See Rodriguez_, 72 F.3d at 1065; _Sumay v. City of New York Health & Hosp. Corp._, No. 97-CV-3606 (SS), 1998 WL 205345, at *6 (S.D.N.Y. Apr. 28, 1998). Even assuming that his determination was incorrect, qualified immunity shields him from liability unless his determination was "plainly incompetent" or amounted to a knowing violation of the law. _See_ Hunter [v. Bryant], 502 U.S. [224,] 229 [(1991)] ("The qualified immunity standard 'gives ample room for mistaken judgments' . . . ." (quoting _Malley v. Briggs_, 475 U.S. 335, 341 (1986))).

2019 WL 2410450, at *11 (emphasis added). Indeed, the Second Circuit instructs that "qualified immunity provides a broad shield," thereby giving officials "'breathing room to make reasonable but mistaken judgments' without fear of potentially disabling liability." _Zalaski v. City of Hartford_, 723 F.3d 382, 389 (2d Cir. 2013) (quoting _Messerschmidt v. Millender_, 565 U.S. 535, 546 (2012)). It employs a deliberately "forgiving" standard of review that "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." _Id._ (citations omitted).

Assuming, arguendo, a Fourth Amendment violation was committed by Mustafa, a contention which the Court has rejected, it was objectively reasonable for Mustafa to determine Plaintiff posed a probable or substantial chance of danger to herself based upon the facts Mustafa knew at the time of her evaluations of Plaintiff.  Moreover, there is no record evidence that Mustafa was plainly incompetent or knowingly violated the law.  In that vein, the Court finds Plaintiff's "blanket denial of the accuracy of medical records [to establish Mustafa's] incompetency is untenable; as stated in Kulak, 'bare denials of statements allegedly made by patients under such circumstances [are not] enough to defeat summary judgment.'" Aouatif, 2019 WL 2410450, at *8 (quoting Kulak v. City of N.Y., 88 F.3d 63, 76 (2d Cir. 1996)).  Rather, the Stony Brook CPEP "records, created contemporaneously by trained medical professionals, bely [Plaintiff's] bald claims that she was" detained-for-transport without probable cause.  Id.

Further, Plaintiff's reliance on her medical expert's Declaration fares no better; the Court finds the Stastny Declaration inadequate to establish a disputed issue of fact as to whether Mustafa's diagnosis fell substantially below accepted professional judgment.  Of note, in making his Declaration, Stastny stated "when there was a factual dispute in the testimony, I have assumed as true the factual version that was more favorable to [Plaintiff]." (Stastny Decl. ¶ 6.)  Thereafter, Stastny baldly

relied upon Plaintiff's blanket denials that, when she presented on July 24, 2015, she was not depressed (see id. ¶¶ 23, 24, 26-31) in support of his contention that "the conclusion that [Plaintiff] suffered from a primary depressive or major depressive disorder amounted to a substantial departure from clinical standards." (Id. ¶ 34.)  Stastny also relied upon non-contemporaneous information to support his conclusion.  (Id. ¶ 40 (relying upon: Plaintiff's 2018 deposition; Plaintiff's 2018 office visit and follow-up phone call with Stastny; Plaintiff's 2020 post-deposition affidavit (which the Court has declined to consider); and, the 2020 affidavits of Plaintiff's Husband, friend, and employer).)  Yet, it is well-settled that "courts must look to 'the specific observations and information available' at the time of the seizure" when determining whether probable cause existed to justify the detention-for-transport.  Aouatif, 2019 WL 2410450, at *9 (emphasis added; citations omitted).  To the extent Stastny implies there was a pre-determination to detain Plaintiff (see Stastny Decl. ¶¶ 39, 64), the Court finds Stastny's assertion to be bald, conclusory, and speculative and, therefore, insufficient to preclude summary judgment.  See Bryant, 462 F. Supp. 3d at 258 (instructing a party may not rely upon conclusory allegations or unsubstantiated speculation to defeat a summary judgment motion).

Additionally, the Court finds Stastny's Declaration fails to establish disputed issues of fact regarding whether

Mustafa's determination to detain-for-transport Plaintiff fell below acceptable standards of medical care thereby warranting a denial of qualified immunity. Stastny baldly premises his opinion upon Plaintiff's unfounded position that Mustafa engaged in only one, 10-minute in-person evaluation of Plaintiff. (See, e.g., Stastny Decl. ¶¶ 49, 62.) First, there is no per se rule that a 10-minute evaluation is insufficient for a doctor to make a medical determination such as Mustafa's. But, cf., Bryant, 462 F. Supp. 3d at 264 (finding defendant-doctor lacked reasonable basis to conclude patient-plaintiff posed a substantial threat to others where, inter alia, defendants were unable to substantiate doctor "could reach an informed decision based on an interview that lasted only between three and five minutes"). Second and more important, Plaintiff has failed to present competent evidence disputing Mustafa's deposition testimony that she met with Plaintiff at least three times, with only one of those meetings lasting approximately 10 minutes. Because Stastny's 10-minute contention derives from his misplaced reliance upon Plaintiff's Affidavit, which the Court has declined to consider having found it to be a "sham" affidavit, his opinion regarding Mustafa's determination is unavailing. (Compare, e.g., Pl. Aff. ¶57, with Mustafa Dep. Tr., Ex. M-L, at pp. 46-48 (testifying to having met with Plaintiff four times with meetings ranging from upwards of 45 minutes to 10 minutes).) Indeed, given the ample undisputed evidence that, in addition to

considering collateral sources of information, Mustafa spent appropriate time with Plaintiff to sufficiently evaluate her before determining Plaintiff was a probable danger to herself warranting her transport to Brunswick for further evaluation, at the very least, a rational jury would be compelled to find reasonable doctors could disagree about the legality of Mustafa's conduct given the circumstances presented.  Hence, under such a scenario, Mustafa is entitled to qualified immunity.  In sum, "[i]n light of the delicate circumstances" presented by Plaintiff on July 24, 2015, "and the decision that [Mustafa] was compelled to make between ensuring [Plaintiff's] safety and ignoring possible warning signs of a dangerous psychotic episode, [Mustafa] should not be held liable for making the decision [s]he did."  Aouatif, 2019 WL 2410450, at *11.  Rather, granting "[q]ualified immunity under these circumstances seems particularly appropriate when considering how we would judge the legality of a contrary decision by [Mustafa]."   Id. (quoting Anthony v. City of N.Y., No. 00-CV-4688, 2001 WL 741743, at *6 (S.D.N.Y. July 2, 2001)).

Regarding Fifth Cause of Action:  The Court agrees with Mustafa that it is not readily apparent Plaintiff is putting forth a Fourth Amendment claim via his Fifth Cause of Action, but rather, that this cause of action reads as being based upon a violation of MHL § 9.37.  Thus, presented with a Section 1983 claim based upon a violation of a state statute, this cause of action is not

sustainable.  See Aouatif, 2019 WL 2410450, at *6 (identifying the deprivation of "a right, privilege or immunity secured by the Constitution and laws of the United States" as a necessary component of a Section 1983 claim); cf. Keenan, 2019 WL 3410006, at *13 (articulating necessary components of a Section 1983 cause of action).  Hence, having failed to identify a deprivation of a right pursuant to the Constitution and its laws in her Fifth Cause of Action, Plaintiff cannot succeed on this claim.

To the extent Plaintiff seeks to clarify her Fifth Cause of Action, explaining it should be read as raising a Fourth Amendment false imprisonment claim (see Opp'n at 26), the Court rejects that attempt.  It is settled law that one may not amend one's complaint via an opposition to a summary judgment motion.  See, e.g., Smith v. City of N.Y., 385 F. Supp. 3d 323, 338 (S.D.N.Y. 2019) ("Because 'a party may not use his or her opposition to a dispositive motion as a means to amend the complaint, it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'" (first quoting Shah v. Helen Hayes Hosp., 252 F. App'x 364, 366 (2d Cir. 2007); then quoting Beckman v. U.S. Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000)) (collecting cases) (cleaned up)).  However, even if the Court were to construe Plaintiff's Fifth Cause of Action as raising a Fourth Amendment claim, the Court agrees with Mustafa that there would then be no discernable difference between Plaintiff's First

and Fifth Causes of Action.  Thus, the Court's finding of no violation of Plaintiff's Fourth Amendment rights by Mustafa would apply equally to Plaintiff's Fifth Cause of Action, as would the Court's alternative finding that Mustafa would be entitled to qualified immunity based upon the record presented.  Hence, even if deemed to be a Fourth Amendment-based cause of action, Plaintiff's Fifth Cause of Action against Mustafa fails.

Regarding Plaintiff's State Law Claims:  The reader is referred to Part II(B)(2) of the Court's DISCUSSION (see infra at 71-73) for the Court's ruling regarding Plaintiff's state law claims against all Defendants.

B.   The Hospital Defendants' Summary Judgment Motion

Plaintiff raises four Section 1983 claims against Onuogu and Sial (together, the "Hospital Doctors"), to wit, her: (1) Fourth Cause of Action, alleging the Hospital Doctors violated the Fourth and Fourteenth Amendments by involuntarily hospitalizing Plaintiff without probable cause, in violation of MHL § 9.37; (2) Fifth Cause of Action, alleging her confinement was not otherwise privileged since she did not meet the criteria for hospitalization under MHL § 9.37; (3) Sixth Cause of Action, alleging a violation of her Fourteenth Amendment substantive due process rights resulting from her involuntary confinement which was not justified since she did not pose a danger to herself due to mental illness; (4) Seventh Cause of Action, alleging a violation of her Fourteenth

Amendment substantive due process rights since the Hospital Doctors failed to spend the necessary amount of time to accurately assess Plaintiff's level of harm to herself.  As to Onuogu only, Plaintiff brings another federal claim, i.e., the Eighth Cause of Action, in which she alleges, due to the Hospital's policy of accepting transferred patients for admission without a psychiatric evaluation, Onuogu violated Plaintiff's Fourteenth Amendment procedural due process rights.

Plaintiff also brings state law claims against the Hospital Doctors, i.e., her: (1) Tenth Cause of action, alleging false imprisonment; (2) Twelfth Cause of Action, alleging medical malpractice; and (3) Thirteenth Cause of Action, also alleging medical malpractice.  Plaintiff also raises another false imprisonment claim against Onuogu only in her Eleventh Cause of Action.

Plaintiff's claims against Brunswick are all based upon state law; they are her: (1) Tenth Cause of Action, alleging false imprisonment as a result of a departure from accepted clinical standards; (2) Eleventh Cause of Action, alleging false imprisonment as a result of violating MHL § 9.37; (3) Twelfth Cause of Action, alleging medical malpractice as a result of a departure from accepted clinical standards since the Hospital Doctors failed to spend adequate time in assessing Plaintiff; and (4) Thirteenth Cause of Action, alleging medical malpractice as a result of a

departure from accepted clinical standards when the Hospital doctors ignored Plaintiff's statements that she did not have suicidal thoughts or intents.

The Hospital Defendants request the entry of summary judgment in their favor dismissing all claims and causes of action asserted against them by Plaintiff.

      1.   <u>The Parties' Positions</u>

      a.   <u>The Hospital Defendants' Position</u>

<u>Regarding Fifth Cause of Action</u>:  Similar to Mustafa, the Hospital Defendants argue this claim should be dismissed because Plaintiff "does not identify a constitutional or federal statutory right that is separate and apart from the violation of the Fourth and Fourteenth Amendments alleged in the other causes of action."  (H-Support Memo at 4.)  Thus, since Section 1983 is not an independent source of substantive rights, this cause of action should be dismissed.  (See <u>id.</u>)

<u>Regarding Fourth, Sixth, and Seventh Causes of Action</u>: Asserting they are not state actors since Brunswick is a private hospital and the Hospital Doctors are private psychiatrists on the Hospital's staff,[16] the Hospital Defendants argue Plaintiff's Section 1983 claims against them are not sustainable.  (H-Support

---

[16]  Indeed, the Hospital Defendants contend Plaintiff's failing to have alleged they are state actors in her TAC is a fatal pleading defect.  (See <u>id.</u> at 6 n.1 (citing <u>Gomez v. Toledo</u>, 446 U.S. 635, 640 (1980); further citation omitted).)

Memo at 6 (further articulating Plaintiff cannot satisfy any of the three tests for determining state action); see also id. at 7 (asserting case law "makes clear that a private hospital and private psychiatrists cannot be deemed state actors simply because they confine patients pursuant to [MHL], as this does not satisfy any of the three tests for state action under § 1983" (citations omitted).)  The Hospital Defendants proceed to focus on the third state action test, i.e., the "public function" test.  (See id. at 5 (defining the three state action tests); see also id. 7-8 (re: Onuogu), 8-9 (re: Sial).)  They contend the record evidence demonstrates the Hospital Doctors each acted independently, personally conducting face-to-face evaluations of Plaintiff, in addition to relying upon other collateral sources of input as to Plaintiff's then-presenting condition.  (See id. at 7-9.)  Indeed, "the documented history [the Hospital Doctors] obtained directly from the Plaintiff--through her statements and their mental status examination findings--demonstrates that [the Hospital Doctors] primarily utilized independent judgment, thereby separating themselves from the preceding state action on the part of Dr. Mustafa."  (Id. at 9 (citing Jackson, 2018 WL 340014, *17).)  Hence, similar to Judge Spatt in Bryant v. Steele, here, the Court should find that "[h]aving examined the Plaintiff, the Brunswick Defendants are not state actors, thus eliminating a necessary condition to being sued under § 1983."  (Id. at 10 (quoting Bryant

v. Steele, 462 F. Supp. 3d 249, 268 (E.D.N.Y. 2020)).)   And,
similar to Bryant, this Court should reject Plaintiff's
self-serving claims of truncated examinations by the Hospital
Doctors, in an attempt to create disputed issues of fact to defeat
summary judgment, especially when the summary judgment record
shows otherwise.  (See id. at 10-11.)

      Further Regarding Fourth Cause of Action: Recognizing
an involuntary emergency commitment is entitled to due process
that comports with a reasonable degree of medical accuracy as
defined, for example by MHL § 9.37, the Hospital Doctors also
assert "MHL § 9.37 implicitly defers to medical judgment[, which]
requires a physician to make a medical decision guided by standards
that are generally accepted within the medical community."
(H-Support Memo at 14 (citing Rodriguez, 72 F.3d at 1062-63).)   In
accordance therewith, the Hospital Doctors argue "[d]ue process
does not 'require a guarantee that a physician's assessment of the
likelihood of serious harm be correct.'" (Id. (quoting Rodriguez,
72 F.3d at 1062).)   Rather, as they maintain they have done here,
a doctor need only comport with accepted judgment, practice or
standards.  (See id. at 14 -15 ("In their respective determinations
pursuant to MHL § 9.37, Dr. Onuogu and Dr. Sial exercised their
independent medical judgment after considering the history they
obtained from Plaintiff, her presentation, and their mental status
exam findings, as well as the CPEP records that accompanied

[Plaintiff] to Brunswick Hospital.").)  The Hospital Doctors would have this Court reject Plaintiff's assertion that it was improper for them to consider the collateral information from Mustafa arguing "[t]here is no authority supporting Plaintiff's contention that a physician must corroborate collateral information when there is no indication that it is unreliable."  (Id. at 15 (citations omitted).)  In any event, the Hospital Doctors lay out their respective evaluations of Plaintiff evincing their having reasonably exercised their medical judgment well within the range of competent care.  (See id. at 16-17 (re: Onuogu); see also id. at 17-19 (re: Sial).)  And, said evaluations substantiate that, at the time of her presentation, there were reasonable grounds for believing Plaintiff had a mental illness for which immediate hospitalization was appropriate since Plaintiff was a danger to herself.  (See id. at 19-20 (further relying upon an expert opinion to support Hospital Doctors' position they "acted within the standard of care in diagnosing Plaintiff with major depressive order and in determining that she presented a substantial risk of harm due to her suicidality during her involuntary admission" (citing Bardey Decl., Ex. H-A)).)  Hence, because the Hospital Doctors acted reasonably in making their then-present assessments of Plaintiff, as a matter of law, they are entitled to judgment in their favor as to Plaintiff's Fourth Cause of Action.  (See id. at 20.)

Regarding Eighth Cause of Action:   The Hospital
Defendants remind the Court that Plaintiff currently maintains
this cause of action against Onuogu only.  (H-Support Memo at 12.)
They characterize this claim as a "Monell-type claim" whereby
Plaintiff asserts her Fourteenth Amendment rights have been
violated due to the Hospital's purported policy of accepting
transferred patients for admission without the benefit of an
independent psychiatric evaluation.  (See id.)  However, since a
Monell claim requires action taken under color of law and Onuogu
is not a state actor, this cause of action is untenable.  (See id.
(stating the requirements of a Monell claim (quoting Roe v. City
of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008)))).)   Moreover,
according to the Hospital Defendants, Plaintiff has failed to
assert any facts supporting her contention the Hospital has a
policy or custom of admitting psychiatric patients without
performing independent evaluations of such patients.  (See id. at
12-13.)   Relatedly, they argue it is not enough to infer the
Hospital has a policy or custom simply because Brunswick
psychiatrists agree with assessments made by referring CPEP
psychiatrists determining patients require involuntary
hospitalization, especially given the lack of evidence supporting
such a contention.   (See id. at 13.)   Hence, the Hospital
Defendants contend Plaintiff's Eighth Cause of Action must fail.

Regarding Alternative Claim of Qualified Immunity:
While not conceding Plaintiff is able to establish any Section
1983 claims against them, the Hospital Doctors alternatively argue
that upon the assumption of same, they would be entitled to
qualified immunity since they "had more than sufficient
information from their personal interactions with Plaintiff and
their review of her CPEP records to reasonably determine that she
was depressed and suicidal . . . ." (H-Support Memo at 20, 22.)
Likewise, there is no summary judgment evidence showing the
Hospital Doctors "were plainly incompetent or knowingly violated
the law." (Id. at 22.) Accordingly, neither Hospital Doctor
violated Plaintiff's Fourth or Fourteenth Amendment rights. (See
id.) "[A]nd, in any event, any alleged violation was not so clear
that no reasonable psychiatrist could have believed that their
actions did not violate such right. On the contrary, at most,
reasonable officials would disagree on whether [the Hospital
Doctors] violated Plaintiff's rights, which is sufficient for
qualified purposes." (Id.) Accordingly, the Hospital Doctors
would be entitled to qualified immunity. (See id.)

Regarding Plaintiff's State Law Claims: As to
Plaintiff's medical malpractice claims, the Hospital Doctors
contend the record evidence demonstrates they each "performed
sufficient examinations and met the accepted standards for
reasonable care." (See H-Support Memo at 23.) Moreover, the

Page 56 of 74

Hospital Doctors' medical expert's opinion confirmed same. (See id.)  Hence, the Hospital "Defendants are entitled to summary judgment with respect to Plaintiff's Twelfth and Thirteenth Causes of Action." (Id.)

As to Plaintiff's false imprisonment claims, the Hospital Defendants contend Plaintiff has not pled a cause of action pursuant to Section 1983. (See H-Support Memo at 23.)  More particularly, they argue that because the record evidence demonstrates the Hospital Doctors complied with the statutory requirements of the applicable MHL, thereby establishing a lack of medical malpractice, their involuntary confinement of Plaintiff is privileged; hence, false imprisonment is not had.  (See id.)

For completeness, the Hospital Defendants also contend that, if the Court determines they are state actors entitled to qualified immunity as to Plaintiff's federal and constitutional law claims, then the Court should also afford them qualified immunity as to Plaintiff's state law claims.  (See id. at 24 (collecting cases).)  Based upon such immunity, Plaintiff's medical malpractice and false imprisonment causes of action should be dismissed.

Regarding Alternative Request to Decline Supplemental Jurisdiction:  If the Court dismisses Plaintiff's federal constitutional claims against them, the Hospital Defendants ask the Court, in its discretion, to decline supplemental jurisdiction

over Plaintiff's state law claims. (See H-Support Memo at 24-25.) They assert the relevant factor, i.e., judicial economy, convenience, fairness, and comity, weigh in favor of such declination. (See id.) Moreover, "[g]iven that discovery has already been completed, refiling in state court would present little inconvenience and no prejudice to the parties." (Id. (citing Jackson, 2018 WL 340014, at *21).) Therefore, the Hospital Defendants request Plaintiff's pendent state law claims be dismissed. (See id.)

b.   Plaintiff's Counter-Position

Regarding Hospital Doctors' State Actors Status: Plaintiff argues the Hospital Doctors engaged in state action because they relied upon state-actor-Mustafa's evaluation of Plaintiff made in deciding to have Plaintiff transported to Brunswick. (See Opp'n at 21.) In other words, Plaintiff contends "the civil commitment scheme set forth in Mental Hygiene Law § 9.37 created 'an ongoing relationship . . . for the case of . . . patients in need of hospitalization,' which warrants a finding of state action." (Id. at 21-22 (quoting Rodriguez v. Plymouth Ambulance Serv., 577 Ff.3d 816, 831 (7th Cir. 2009)).) Plaintiff also maintains "[q]uestions of fact exist as to whether Drs. Onuogu and Sial exercised independent medical judgment" since no doctor can make a mental illness and dangerousness assessment in five minutes, as Onuogu purportedly did, or reach a conclusion about a

patient's clinical state upon initial introduction, as Sial purportedly did.  (Id. at 22.)

Regarding Presence of Probable Cause:  Relying upon Stastny's opinion, Plaintiff advances the argument that the Hospital Doctors lacked any reasonable basis for concluding she posed a substantial threat of harm.  (See Opp'n at 24.)  Stastny generally testified: a psychiatrist requires an adequate face-to-face evaluation of a patient to determine the patient's mental status and level of risk (see id. at 24 (citing Stastny Decl. ¶¶ 9, 39)); and, while permitted to rely upon information from collateral sources, a psychiatrist is still required to verify such information from the patient (see id. at 24-25 (citing Stastny Decl. ¶ 10)).  Then, relying upon her post-deposition Affidavit, Plaintiff contends "she never felt depressed, never had a suicide[al] thought in her life, and never felt unsafe" and that "[a]ll of this information was available to Drs. Onuogu and Sial if they simply took the time to evaluate her in a way that comported with professional standards," but "[t]hey did not."  (Id. at 25.)  Thus, the implication is that, since Plaintiff's recollection of what transpired during the Hospital Doctors' evaluations of her differs from the Hospital Doctors' recollections, disputed issues of fact are present precluding summary judgment.

Regarding Fifth Cause of Action:  The reader is referred to Part II(B)(1)(b) of the Court's DISCUSSION (see supra at 33-34),

for Plaintiff's counter-position regarding her Fifth Cause of Action.

Regarding Sixth and Seventh Causes of Action: Beginning with the well-established axiom that "[a]s a substantive matter, due process does not permit the involuntary hospitalization of a person who is not a danger to either herself or others" (Opp'n at 28 (quoting Rodriguez, 72 F.3d at 1061)), Plaintiff maintains "[q]uestions of fact exist as to whether [she] posed a danger to herself or others." (Id. at 29.) Again, she makes this claim based upon her post-deposition Affidavit and the Stastny Declaration, which Declaration substantially relies upon Plaintiff's post-deposition Affidavit (especially regarding the amount of time the Hospital Doctors spent evaluating Plaintiff). (See id.) Plaintiff further argues Stastny's Declaration sufficiently contradicts the Hospital Doctors' claims that they made their decision to involuntarily commit Plaintiff pursuant to MHL § 9.37 in accordance with appropriate medical standards. (See id. at 29-30.) Hence, according to Plaintiff, factual disputes remain which cannot be decided upon summary judgment. (See id.)

Regarding Hospital Defendants' Claimed Qualified Immunity: Without citation to the record, Plaintiff generally contends questions of fact exist regarding the Hospital Doctors' assessments of Plaintiff. (See Opp'n at 32.) Relying upon the Stastny Declaration, Plaintiff argues "[i]t is well-settled that

conflicting expert testimony on medical issues creates an issue of fact that requires resolution by a jury." (Id. at 34 (citing Rodriguez, 72 F.3d at 1063); see also id. ("The plaintiff has submitted expert testimony explaining why the determination by Drs. Onuogu and Sial substantially departed from professional standards." (citing Stastny Decl., ¶¶ 34; 49-64)).) Hence, the implied conclusion is the Hospital Doctors are not entitled to qualified immunity. (See id. ("[I]t was not reasonable for [the Hospital Doctors] to believe that their cursory assessments of the plaintiff could produce accurate assessments." (citing Stastny Decl., ¶¶ 66-68)).)

  Regarding Retention of Supplemental Jurisdiction: The reader is referred to Part II(B)(1)(b) of this Memorandum's DISCUSSION section (see supra at 34), for a summary of Plaintiff's position regarding retention of supplemental jurisdiction.

  c. The Hospital Defendants' Reply

  As to Plaintiff's federal law claims, the Hospital Defendants initially reiterate their position that Plaintiff's bare denials regarding the accuracy of the Hospital's charts documenting Plaintiff's depression and suicidal ideation, which she supports with reliance upon the Second Circuit's Rodriguez case, is untenable given the Circuit Court's subsequent Kulak decision. (See H-Reply at 1.) They proceed to re-state their position that they are not state actors; as such, Plaintiff cannot

maintain Section 1983 causes of action against them.  (See id. at 2-3.)  Moreover, to the extent Plaintiff contends the Hospital Defendants are state actors, her state action position rests upon whether or not the Hospital Doctors examined Plaintiff.  (See id. at 4.)  Because there is ample evidence the Hospital Doctors, indeed, performed their own assessments of Plaintiff, "Plaintiff's flat denials and self-serving assertions that the examinations lasted no more than ten minutes and no psychiatrist could possibly gather sufficient information in the duration of their meeting[s] are not only insufficient in law, but also inconsistent, self-serving, and implausible."  (Id.; see also id. at 4-7 (highlighting record evidence demonstrating sufficient examinations of Plaintiff by Hospital Doctors, thereby debunking Plaintiff's bare denials of same).)  Further, the Hospital Defendants push for alternative relief of qualified immunity if they are found to be state actors.  (See id. at 7-8.)  They assert the summary judgment record supports a finding they acted reasonably in their examinations of Plaintiff and Plaintiff has not presented evidence the Hospital Doctors knowingly violated the MHL.  (See id. ("As documented in the copious and contemporaneous medical records, [the Hospital Doctors'] opinions were objectively reasonable and in accordance with accepted medical []practice." (citing Jackson, 2018 WL 340014, at *21)).)

As to Plaintiff's state law claims, the Hospital Defendants first contend those claims should be dismissed since they, too, are based upon Plaintiff's contention the Hospital Doctors did not spend sufficient time evaluating her, which the summary judgment record debunks.  (See id. at 9.)  Moreover, "because the [Hospital] Defendants' determinations were indisputably discretionary in nature, they are entitled to dismissal of the[] state law claims on qualified immunity grounds."  (Id. (citing Torcivia, 409 F. Supp. 3d at 49).)  Alternatively and finally, the Hospital Defendants continue to press for the Court's declining to exercise supplemental jurisdiction over Plaintiff's state law claims, contending both that Plaintiff's "deep pockets" argument is inappropriate and "re-filing in state court would present only minor inconvenience to the parties."  (Id. at 10.)

    2.   The Court's Decision

Regarding Plaintiff's Federal Claims:  The Court first examines Plaintiff's federal claims, which are all premised upon Section 1983.  See, e.g., Bryant v. Steele, 462 F. Supp. 3d 249, 265 (E.D.N.Y. 2020).

> Section 1983 allows for injured parties to take action against people acting under color of state law.  Fabrikant v. French, 691 F.3d 193, 206 (2d Cir. 2012) (citing 42 U.S.C. § 1983).  "'Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged

conduct constitutes state action.'"  Id. (citing Flagg v. Yonkers Sav. & Loan Ass'n, 396 F.3d 178, 196 (2d Cir. 2005) (internal quotation marks omitted)).  Thus, the § 1983 plaintiff bears the burden of showing state action on the part of the defendant.  Tancredi v. Metro. Life Ins. Co., 316 F.3d 308, 312 (2d Cir. 2003); see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 n.2, 121 S. Ct. 924, 148 L. Ed. 2d 807 (2001) ("If a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, the conduct also constitutes an action 'under color of state law' for § 1983 purposes.").

Id. at 266.

> For the purposes of [S]ection 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ('the compulsion test'); (2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate' ('the public function test').

Sybalski v. Indep. Grp. Home Living Program, Inc., 546 F.3d 255, 257 (2d Cir. 2008) (quoting Brentwood Acad., 531 U.S. at 296); see also Caballero v. Shayna, No. 18-CV-1627, 2019 WL 2491717, *3 (E.D.N.Y. June 14, 2019) (quoting Sybalski); Herring v. Suffolk County Police Dep't, No. 17-CV-5904, 2018 WL 7150357, *4 (E.D.N.Y. Oct. 19, 2018) (same).  "The fundamental question under each test is whether the private entity's challenged actions are 'fairly

attributable' to the state." <u>Fabrikant</u>, 691 F.3d at 207 (quoting <u>Rendell-Baker v. Kohn</u>, 457 U.S. 830, 838 (1982)); <u>Caballero</u>, 2019 WL 2491717, at *3 (quoting <u>Fabrikant</u>).

"Private medical facilities are generally not state actors for purposes of Section 1983." <u>Jones v. Nickens</u>, 961 F. Supp. 2d 475, 484 (E.D.N.Y. 2013) (omitting citations); <u>see also Jackson</u>, 2018 WL 340014, at *14 (finding private hospital and its doctors are not state actors); <u>see also generally Garramone v. SUNY</u>, No. 23-CV-0066, 2023 WL 4471957, at *7 (E.D.N.Y. July 11, 2023) ("[P]rivate parties are not generally liable under Section 1983." (collecting cases)).  There is no dispute Brunswick is a private psychiatric hospital and the Hospital Doctors were private psychiatrists on staff at the Hospital.  (See P-H 56.1 Counter. ¶¶ 117 (re: Hospital), 135 (re: Onuogu), 166 (re: Sial).)

In advancing their position that they are not state actors, the Hospital Defendants press for a state actor analysis under the "public function test", which Plaintiff does not contest.[17]  "To satisfy the state action requirement under the

---

[17] The Court finds that by having acquiesced to the Court focusing only upon the state actor public function test, as evidenced by Plaintiff having failed to advance arguments in support of the Court analyzing whether the Hospital Defendants are state actor pursuant to either the compulsion test or the joint-action test, Plaintiff is deemed to have abandoned the application of those tests.  See, e.g., <u>Butler</u>, 2023 WL 5096218, at *29 n.34 (finding, where non-movant did not meaningfully respond to an argument raised in support of summary judgment, court may deem claim abandoned) (collecting cases).  Yet, given the summary judgment record, it is

'public function' test, the private entity must 'perform a function that is traditionally the exclusive prerogative of the state.'" Archer v. Econ. Opportunity Comm'n, 30 F. Supp. 2d 600, 606 (E.D.N.Y. 1998) (quoting Rendell-Baker, 457 U.S. at 842); see also Caballero, 2019 WL 2491717, at *3 ("Under the public function test, '[s]tate action may be found in situations where an activity that traditionally has been the exclusive, or near exclusive, function of the State has been contracted out to a private entity.'" (quoting Grogan v. Blooming Grove Volunteer Ambulance Corps, 768 F.3d 259, 264-65 (2d Cir. 2014) (internal quotations and citation omitted)); Herring, 2018 WL 7150387, at *5 (quoting Archer). Upon the summary judgment record presented, Plaintiff cannot establish state action under the public function test since "the hospitalization authority that the MHL bestows on hospitals and physicians is not the sort of power traditionally reserved for the State because '[t]he responsibility for invalid commitment lies with the physician as a private individual,' and thus fails to satisfy the public-function test." Jackson, 2018 WL 340014, at

_____

unlikely Plaintiff could have established the Hospital Defendants were state actors pursuant any of the state actor tests. See, e.g., Bryant v. Steele, 93 F. Supp. 3d 80, 90 (E.D.N.Y. 2015) (ruling upon dismissal motion, collecting cases where district courts in this Circuit "have found that none of the three tests for state action—'state compulsion,' 'public function,' and 'close nexus'—were satisfied"); cf., e.g., Jackson, 2018 WL 340014, at *14-15 (discussing compulsion test), and at *15-17 (discussing joint-action test); Keenan, 2019 WL 3410006, at *20 (discussing compulsion test), and at *19 (discussing joint-action test).

*14 (quoting Jackson v. Metro. Edison Co., 419 U.S. 345, 353 (1974)). Moreover, "[t]he Second Circuit has recognized that private hospitals, though 'clearly affected with a public interest, have not been traditionally associated with sovereignty, and have long been relegated to the private domain, rather than treated as traditionally the exclusive prerogative of the State.'" Id. at *17 (quoting Schlein v. Milford Hosp., Inc., 561 F.2d 427, 429 (2d Cir. 1997); further citation omitted; further internal quotation marks omitted); see also, e.g., Keenan, 2019 WL 3410006, at *20 ("As an initial matter, 'care of patients by doctors is not a function that is 'exclusively reserved by the state''" (quoting Herring, 2018 WL 7150387, at *5 (further citations omitted)). Plaintiff offers no evidence to rebut this presumption. "Thus, in the absence of any evidence to the contrary, the Court shall assume the same in the more specific context of involuntary hospitalizations." Id. (citing Turturro v. Cont'l Airlines, 334 F. Supp. 2d 383, 396-97 (S.D.N.Y. 2004)). Given this dearth of evidence, "Plaintiff has failed to establish [the Hospital Defendants] acted at the behest of the State in a sense that would render them subject to constitutional scrutiny." Id. at *18. Therefore, as a matter of law, no Section 1983 liability may be claimed against the Hospital Defendants; accordingly, summary judgment is awarded in the Hospital Defendants' favor as to all of Plaintiff's federally based Causes of Action.

Furthermore, even if the Hospital Defendants were found to be state actors, upon the summary judgment record presented, qualified immunity would shield them from Section 1983 liability. There is no dispute "Plaintiff did enjoy a clearly-established right not to be hospitalized absent a showing of dangerousness." Jackson, 2018 WL 340014, at *20 (emphasis in original); see also MHL § 9.37.   However, in making their determination to commit Plaintiff to Brunswick, the Hospital Doctors acted reasonably in determining Plaintiff was a danger to herself.   A state actor's decisions "must be viewed as objectively reasonable unless 'no [state actor] of reasonable competence could have made the same choice in similar circumstances.'"   Id. (quoting Green, 465 F.3d at 92; further citation omitted).

Here, as to Onuogu, the undisputed facts establish he acted reasonably in applying for Plaintiff's commitment to Brunswick pursuant to MHL § 9.37.   There is ample competent, undisputed evidence that Onuogu consulted collateral sources regarding Plaintiff, as well as conducted his own face-to-face evaluation of Plaintiff.   (See supra BACKGROUND, Part I(B), at 10-11.)   The record evidence further establishes that from both, Onuogu determined Plaintiff as having major depressive disorder and, after weighing Plaintiff's risk and mitigating factors, posing a substantial risk of danger to herself, thereby warranting commitment.   (See id. at 11-12.)   Thus, Onuogu's determination

regarding Plaintiff fell within acceptable clinical standards. Indeed, at the very least, even applying the applicable medical standards articulated by Stastny (see Stastny Decl. ¶¶ 9-18), reasonable psychiatrists could disagree as to whether Plaintiff was dangerous.  (Cf. id. at ¶ 18 ("Professional standards further require that psychiatrists make a reasoned assessment about the magnitude of risk that a person poses.  There are some instances in which the level of risk is not so high or so low that reasonable psychiatrists can, and will, disagree as to whether the patient is dangerous.").)  To the extent Stastny contends Onuogu acted in a manner falling below acceptable clinical standards, asserting Onuogu failed to spend sufficient time with Plaintiff before making his commitment determination, the Court rejects same.  Stastny's position is flawed because he bases it upon Plaintiff's unsubstantiated claim that Onuogu spend no more than 10 minutes with her in conducting a face-to-face evaluation.  The undisputed summary judgement record establishes otherwise.  (See supra BACKGROUND, Part I(B), at 10-12.)  Hence, as a matter of law, Onuogu would be entitled to qualified immunity from Plaintiff's Section 1983 claims.  See Aouatif, 2019 WL 2410450, at *11; (see also supra at 44-47 (articulating Court's rationale for finding Mustafa entitled to qualified immunity, which rationale the Court finds equally applies here to Onuogu).

Similarly, as to Sial, the undisputed facts establish she acted reasonably in continuing Plaintiff's hospitalization at Brunswick pursuant to MHL § 9.37. Again, the Court finds ample competent, undisputed evidence as to Sial both consulting collateral sources regarding Plaintiff, as well as conducting several face-to-face evaluations of Plaintiff. (See supra BACKGROUND, Part I(B), at 12-16.) Said evidence demonstrates Sial determined Plaintiff to have major depressive disorder and, after weighing Plaintiff's risk and mitigating factors, posed a substantial risk of danger to herself, thereby warranting commitment. (See id. at 13-14.) Nothing in the record evidence shows Sial's determination regarding Plaintiff fell below acceptable clinical standards; at most it evinces, reasonable psychiatrists could disagree as to whether Plaintiff was dangerous. This is so even, again, applying the applicable medical standards articulated by Stastny. (See Stastny Decl. ¶¶ 9-18.) And, for the same reason the Court rejected Stastny's contention that Onuogu acted in a manner falling below acceptable clinical standards, i.e., not having spent sufficient time personally evaluating Plaintiff, which the Court rejected as a flawed assumption, it likewise rejects Stastny same claim of Sial spending insufficient time with Plaintiff to properly evaluate Plaintiff. (See supra at 44-47.) Thus, upon the record presented, Sial would be entitled to qualified immunity from Plaintiff's Section 1983

claims.  See Aouatif, 2019 WL 2410450, at *11; (see also supra at 43 (articulating Court's rationale for finding Mustafa entitled to qualified immunity, which rationale the Court finds equally applies here to Sial).

Regarding Plaintiff's State Law Claims:  While "the district court[] shall have supplemental jurisdiction over all other claims that are related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," in its discretion, the it "may decline to exercise supplemental jurisdiction over a claim" where it "has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(a), (c)(3); see also Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 727 (2d Cir. 2013) ("It is well to recall that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'"); see also One Communications Corp. v. J.P. Morgan SBIC LLC, 381 F. App'x 75, 82 (2d Cir. 2010) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims").  Here, having granted summary judgment in the Defendants'

favor dismissing all of Plaintiff's Section 1983-based claims, the Court finds the interest of judicial economy, convenience, fairness, and comity weigh in favor of not exercising supplemental jurisdiction over Plaintiff's remaining state law claims against all Defendants. See Keenan, 2019 WL 3410006, at *22 ( "[H]aving determined that the [defendants] are entitled to summary judgment on all of [plaintiff's] § 1983 claims, the Court declines to exercise supplemental jurisdiction over [plaintiff's] remaining state law claims." (citations omitted)).

Finally, even if the Court did not decline supplemental jurisdiction over Plaintiff's state law claims, the Court would find all Defendants are entitled to qualified immunity against Plaintiff's state law claims because the record evidence established the Defendants acted reasonably, i.e., within accepted clinical standard, in making their respective MHL § 9.37 determinations.[18] See, e.g., Mesa, 2013 WL 31002, at *12 (finding, where the state law "reasonableness standard is the same standard

_____

[18]  The Court rejects Plaintiff's reliance on the Applewhite case for the proposition that "the government immunity doctrine 'has no application in cases where the State engages in a proprietary function . . . such as providing medical and psychiatric care.'" (Opp'n at 35 (quoting Applewhite, 21 N.Y.3d at 433).) The quoted language from Applewhite comes from a concurrence opinion in which the concurring judge stated: "I concur in the result, but not the reasoning of the majority opinion." Applewhite, 21 N.Y.3d at 432. The Applewhite majority found the state actors, who were EMTs, were performing a governmental function and therefore, were entitled to immunity.

as that applied in federal qualified immunity analysis", "where an officer's actions are deemed objectively reasonable, that officer will be immune under both federal and state law"); see also Triolo v. Nassau County, N.Y., No. 16-CV-2085, 2019 WL 5742623, *7 (E.D.N.Y. Nov. 4, 2019) (same; quoting Mesa), aff'd in part, 24 F.4th 98, 109-10 (2d Cir. 2022).


CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

I.   As to **Mustafa**'s Summary Judgment Motion (ECF No. 116), it is **GRANTED**; as a result:

   (a)   Plaintiff's federal claims, i.e., her First and Fifth Causes of Action, are dismissed with prejudice; and

   (b)   having declined to exercise supplemental jurisdiction over Plaintiff's state law claims, i.e., her Ninth, Tenth, Twelfth, and Thirteenth Causes of Action, they are dismissed without prejudice; and

II.  As the **Hospital Defendants'** Summary Judgment Motion (ECF No. 120), it is **GRANTED**; as a result:

   (a)   Plaintiff's federal claims, i.e., her Fourth, Fifth, Sixth, and Seventh Causes of Action, are dismissed with prejudice; and

   (b)   having declined to exercise supplemental jurisdiction over Plaintiff's state law claims, i.e., her Eighth,

Tenth, Eleventh, Twelfth, and Thirteenth Causes of

Action, they are dismissed without prejudice; and

III. Once Judgment has entered, the Clerk of Court is directed to

CLOSE this case.

**SO ORDERED.**

/s/ JOANNA SEYBERT
JOANNA SEYBERT, U.S.D.J

Dated:     March 28, 2024
           Central Islip, New York